THE PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*
EDWARD HEMPSTEAD *et al.*

*v.*

THE CHICAGO & ALTON RAILROAD COMPANY.

1. RAILROADS—*of their duty as to delivery of freight beyond their own lines.* A railroad company can not be compelled, as common carriers, to receive goods at stations along their line for transportation, on the requirement of the consignor that they shall, themselves, deliver the goods at a point beyond or off their own line of road, or to deliver goods received by them for transportation, at such point. The legal duty of the company in that regard is commensurate only with their franchise; it is confined to their own line of road, and can not be made to extend beyond it.

2. SAME—*of their duty to acquire facilities to deliver goods beyond their own lines.* Nor can a railroad company, chartered with certain express powers and privileges, with certain *termini* within which they are to be exercised, be compelled to purchase, for the accommodation of the public,

more extended privileges beyond the limits of their franchise, so that they may deliver goods at points not upon the line of their road, or within its established *termini.*

3.   So where it was sought to compel a railroad company to receive a quantity of grain at one of their stations, to be transported and delivered at a certain grain elevator in the city of Chicago, it appeared such elevator was situated upon a side or switch track which connected with the road of the company in that city, but was beyond its actual *terminus.*   The side or switch track was constructed, owned and controlled by other companies, with whom the company against whom the remedy was sought, had no arrangement for its use, except as might be specially agreed upon in particular instances, though, under an ordinance of the city, that company could have compelled an arrangement for its regular and permanent use:   *Held,* the company could not be compelled to receive the grain to be delivered at such elevator beyond the *terminus* of their own road, nor could they be compelled to acquire the right to use the switch track leading from their road to the elevator for the purpose of such delivery.

4.   Nor would the rights of the parties in that regard be affected by the fact that such company had previously, in repeated instances, delivered freight at that elevator, by the use of such switch track running thereto but by virtue of special agreements to that effect.

5.   In order to compel a railroad company to deliver grain, shipped on their road in bulk, at a particular elevator to which it may be consigned, it is indispensable such elevator must be connected by some track with the railroad line of the company, and be, in fact, a portion thereof, or such as would be regarded a portion thereof, for the purposes of such delivery, under the act of 1867, entitled, "Warehousemen."

6.   RAILROADS—*duty to carry grain in bulk.*   Railroad companies can not disregard the custom which has obtained, of conveying grain in bulk over the lines of their own roads, and delivering it at any elevator thereon to which it may be consigned.   If consigned to an elevator or warehouse not on their road, and beyond its *terminus,* or if there be no elevator on the road on which the grain is carried, then they may rightfully refuse to receive it in bulk.

7.   MANDAMUS—*whether awarded.*   A mandamus should never be awarded except the relator has a clear legal right to have the thing sought by it done, and in the manner and by the person or body sought to be coerced, and must be effectual as a remedy if enforced, and it must be in the power of the party, and his duty also, to do the act sought to be done—the writ confers no new authority upon him, and the duty must be a public one, and must be imperative and not discretionary.

8.   Mr. JUSTICE SHELDON holds, that so long as a railroad company actually makes use of the track of another company, leading from their own

road to an elevator, in running their cars, it is their duty to deliver grain there, under the rule in Vincent's case, 49 Ill. 33.

9.    Mr. JUSTICE SCOTT is of opinion, it was the duty of the company in this case to receive the grain and deliver it to the elevator designated, but that the remedy is not by mandamus, there being another complete remedy.

10.    Mr. JUSTICE WALKER holds, that mandamus is the proper remedy to compel a railroad company, when it is their duty to do so, to carry grain in bulk and deliver to the elevator to which it is consigned; also, that when a road enters the city of Chicago, the company should deliver grain there at any elevator to which it may be consigned, either upon their own road, or upon the road of any other company with which they have running arrangements, unless in so doing they would incur unreasonable expense; but that a company can not be compelled to construct or acquire facilities for such delivery beyond their own line.

This was an application, in the name of the People, on the relation of Edward Hempstead and Calvin T. Wheeler, for a writ of mandamus, to compel the Chicago & Alton Railroad Company to receive, at one of the stations upon the line of their road, a quantity of grain in bulk, to be delivered by the company at the elevator of the relators, in the city of Chicago. The company had refused to receive the grain for transportation, because it was consigned to that elevator. The reasons for such refusal are set forth in their return to the alternative writ, and will be found in the opinion of the court.

Messrs. GOUDY & CHANDLER and Messrs. KING, SCOTT & PAYSON, for the relators.

The duty of the Chicago & Alton Railroad Company in the premises, and the right to recover damages at law, or inflict the penalty prescribed by the statute, was settled by this court at the last term. *Vincent et al.* v. *The C. & A. R. R. Co.* 49 Ill. 33.

The railroad company will be compelled by mandamus to perform its corporate duties, and to receive and deliver all goods as directed.

" No better general rule can be laid down upon this subject than that where the charter of a corporation, or the general

7—55TH ILL.

statute in force and applicable to the subject, imposes a specific duty, either in terms, or by fair or reasonable construction and implication, and there is no other specific or adequate remedy, the writ of mandamus will be awarded." 2 Redfield on Railways, 279.

A mandamus has been awarded to compel a railroad company to run its cars to a particular point, and there to receive and discharge passengers. *State* v. *Hartf. & N. H. R.* 29 Conn. 538; *People* v. *The Albany & Vt. R.* 24 N. Y. 627.

It has been ordered to compel a turnpike company to fence its road. *Reg.* v. *Trustees Luton Roads,* 1 Q. B. 860. To restore a highway to its former width. *Reg.* v. *Birming. & Glou. R.* 2 Rail. C. 694. To establish a uniform rate of tolls. *Clarke* v. *L. & N. Union Canal,* 6 Q. B. 898. To build a bridge. *Cam. & Som.* v. *Charlestown R.* 7 Met. 70. To reinstate its road after the rails have been taken up. *Rex* v. *Severn & Wye R.* 2 B. & A. 646. To bridge a private way. *Habersham* v. *Sav. Canal,* 26 Geo. 283.

A mandamus was applied for to compel a railroad company to receive the goods of the relator, and only refused upon the ground that the company was not, by its charter and custom, carriers of that kind of goods. *Ex parte Robbins,* 7 Dowl. P. C. 566; 2 Shelford on Railways, 846.

The law is discussed, and many cases referred to in Moses on Mandamus, 155, 168, 171, 176; 2 Redfield on Rail. 257, 275, 294.

Mr. A. W. CHURCH, Mr. J. H. HOWE and Mr. GEORGE C. CAMPBELL, for the respondents.

The relators, in order to entitle themselves to the issue of the writ, must show a clear and indisputable legal right to have the thing sought by it done, and in the manner and by the person or body sought to be coerced, and the writ must be effectual as a remedy, if enforced, and it must be in the power of the party, and his duty, also, to do the act required by the

writ.   *The People* v. *Forquer*, Breese, 104; *The People* v. *Gilmer*, 5 Gilm. 242; *Canal Trustees* v. *The People*, 12 Ill. 248; *The People* v. *Hatch*, 33 Ill. 140.

It can not be claimed that the relators, at common law, are entitled to have the respondents' cars delivered at their elevator, because, while the elevator is connected with respondents' road by side or switch tracks, yet it is situated beyond the *terminus* of their road, and they have never acquired the right to use such side or switch tracks, and can not properly be compelled to acquire that right.   *Vincent et al.* v. *Chi. & Alton R. R. Co.* 49 Ill. 33; *Porter* v. *Chi. & R. I. R. R. Co.* 20 Ill. 410; 1 Redfield on Railways, 66.

If relators have no common law rights to be enforced by the issue of this writ, they must show some statutory right, the infringement of which requires the interference of this court, and must rely on the statute of the State of Illinois, approved March 11, A. D. 1869, and here we object to the issuance of the writ to enforce the rights claimed under this act, because,

First.  The statute itself has provided a specific and adequate remedy for an infringement of its provisions.   The penalty imposed by the statute is so heavy that no corporation could afford to violate the provisions of the act if that penalty were enforced against it.   See act March 11, A. D. 1869.

Second.  Where a new right, or the means of acquiring it, is conferred by a statute, and an adequate remedy for its invasion is given by the same statute, parties injured are confined to the statutory redress.   *Smith* v. *Lockwood*, 13 Barb. 217; *Hare* v. *Steamer Hamburg*, 2 Clarke, Iowa, 460; *Dudley* v. *Mayhew*, 3 Comst. 15; *Miller* v. *Taylor*, 4 Burrows, 2305; *Crosby* v. *Bennett*, 7 Met. 17; *Craig* v. *Butler*, 9 Mich. 21; *Thurston* v. *Prentiss*, 1 Mich. 193.

Third.  The act of March 11, 1869, is a violation of the chartered rights of the respondents, as granted by the legislature of the State of Illinois, and is therefore unconstitutional and void.  By the acceptance of their charter, respondents entered

into a contract with the people of the State of Illinois, through the legislature, to build, operate and maintain a railroad from Joliet to Chicago. They did so build a railroad, and fixed its terminus at Madison street, south of the relators' elevator. Having so fixed its terminus, and complied with their contract in that regard, they are not bound to perform the duty of common carriers beyond the terminus of their railroad, and not even the. legislature can compel the respondents to carry goods beyond the terminus of the line over which they profess to be common carriers.

The statute violates the chartered rights of respondents in that it attempts to fix and prescribe the rates which the respondents must charge for doing this particular service, when, by the respondents' charter, the right was granted to respondents to fix their own tolls.

Any law which attempts to alter the duties imposed by the terms of respondents' charter, or to vary the terms of respondents' contract with the people of the State, is in repugnance to the constitution of the United States, and is therefore null and void. *Brigham* v. *Agricultural, etc. R. R. Co.* 1 Allen, 316 ; *Hatch* v. *Vermont Central R. R. Co.* 28 Vt. 142 ; *Buffalo, Corning and N. Y. R. R.* v. *Pottle,* 23 Barb. 21 ; *Hentz* v. *Long Island R. R.* 13 Barb. 646 ; *Walker* v. *Mad River and Lake Erie R. R.* 8 Ohio, 38.

The relators' elevator is located beyond the terminus of the respondents' road, and they could not obey the writ if issued, if they were forbidden so to do by the railroad companies owning the tracks in Water street, in the city of Chicago, over which the respondents' cars must pass in order to reach the elevator.

But the relators assert that, by virtue of the fourth section of an ordinance of the city of Chicago, passed August 16, 1858, under which certain railroad companies were authorized to lay down the tracks which lead from respondents' road to the elevator in question, the respondents have the right to use those tracks. That section is as follows:

" SEC. 4.    Said companies may associate with themselves, in the construction·and use of such tracks, any and all corporations, and any railroad corporations so associated shall possess all the powers herein granted to the said Pittsburgh, Fort Wayne and Chicago, and the Chicago, St. Paul and Fond du Lac Railroad Companies, and said latter companies shall allow and permit the use of the tracks constructed under this ordinance, by any other railroad corporations, upon such terms and conditions as shall be fair and equitable, to be determined, in case of disagreement between the companies, by two disinterested and competent civil engineers, one to be selected by each party, and in case of their disagreement, a third shall be appointed by the judges of the Cook county court of common pleas, and the award and decision of said referees shall be final, conclusive and binding upon the parties."

The court will see that the ordinance confers no such right.    It merely provides that the railroad companies to whom the right to lay down tracks in West Water street is given, *may* associate with them in the construction and use of said tracks any other corporations, and they shall allow and permit the use of said tracks by any other railroad corporation upon terms and conditions to be agreed upon, and a manner is provided for settling those terms and conditions in case of disagreement between the parties.    Relators do not allege that any agreement has ever been entered into by respondents for the use of said tracks, and respondents expressly deny, in their return, that any such agreement was ever made by them.    Respondents have never exercised the option given them by the ordinance, and until they do so, they have no rights in West Water street, except such as are specially granted from time to time by the railroad companies owning the same.    Before a writ of mandamus to deliver cars at the relators' elevator can be made effective, this court must compel the respondents to acquire a right they do not now possess, and as it would be out of the power of respondents, in case the Pittsburgh, Ft. Wayne and

Chicago Railroad Company, or the Chicago & Northwestern Railroad Company, objected, to obey the writ, the writ ought not to issue. *Ex parte Black*, 1 Ohio State, 30; *Turnpike Road* v. *Sandusky*, ib. 149.

The respondents, as common carriers, are not bound to carry goods beyond the terminus of their own line. They may do so by special contract for that purpose, but the fact that the respondents have sometimes carried, by special contract, goods beyond their own line, does not entitle any one to demand that they shall perform similar service whenever he shall think proper to ask it. *Johnson* v. *Midland Railw. Co*, 4 Exch. 369; *Oxlade* v. *Northeastern Railw. Co.* 1 C. B. N. S. 455; *Same* v. *Same*, 15 ib. 680.

Nor are the respondents obliged to receive goods for a point beyond their own line, when the shipper insists, as a condition precedent, that they shall receive them with an undertaking, either express or implied, that they shall be taken in respondents' own cars to a point on the line of a railroad owned by another company; and therefore respondents had the right to refuse the cars of grain at Odell, mentioned in the alternative writ, when the shipper insisted that they should sign a receipt, the effect of which would be to contract to deliver the cars at the relators' warehouse.

If the object of this writ be simply to compel the respondents to receive and transport grain to Chicago, the respondents will not object to its allowance, provided the grain be tendered to respondents in packages proper for transportation.

For the respondents are not bound, as common carriers, to receive any goods for transportation unless the same are delivered to them in safe packages, properly secured against loss in transportation, and convenient for handling and delivering. The carrier is not bound by law to furnish to the shipper the packages in which his goods are placed for transportation. If he does so receive them, he has the right to make any stipulations with the shipper as to the manner in which goods so unpacked shall be delivered at its terminus, and if he furnishes

the packages in which said goods are packed, he has an undoubted right to require that the shipper shall submit to such reasonable conditions as the carrier chooses to impose, which shall insure the carrier as far as practicable in the safe transmission of the goods, and secure the speedy return to the carrier of the packages so loaned by him to the shipper. Grain in bulk is not properly packed for transportation, and the carrier is under no obligation to receive from any one, grain, unless the same is placed in strong, safe sacks, convenient for speedy handling, and delivery at the usual and ordinary depot prepared by the carrier for the purpose of receiving and delivering goods. *Betts* v. *Farmers' Loan and Trust Co.* 21 Wis. 80.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This is an application for a peremptory mandamus, on the relation of Edward Hempstead and others, against the Chicago & Alton Railroad Company.

In the petition of relators, it was prayed that a writ of mandamus issue, directed to this company, commanding them, their agents, officers and employees, to receive all grain which might be delivered to them at any of their receiving stations on the line of their road, consigned to the elevator of relators, and known as the Illinois River Elevator, in the city of Chicago, upon the payment of the usual and customary charges, without unfavorable discrimination, and to deliver all such grain at that elevator in due course of business and without unreasonable and unnecessary delay; and also commanding the agents, officers and employees of this company to receive and transport three certain car loads of corn from Odell to Chicago, and to deliver the same at this elevator, or show cause why they refuse so to do.

Respondents, by way of showing cause, have made an elaborate return to the writ, to which the relators have demurred, thus opening to our consideration the whole merits of the controversy.

It is not denied that relators own and operate the elevator, as alleged, and that they have all the necessary machinery and conveniences for the purposes to which it is devoted, nor is the fact denied that respondents own and operate the Chicago & Alton railroad from East St. Louis to the city of Chicago, but they do deny that they are common carriers to the extent set up and claimed by the relators. The relators claim, that to and from East St. Louis, and all points intermediate that and the city of Chicago, on the line of their road, it is their legal duty to receive all goods and freights delivered to them at any station on their line, and to transport the same to such stations and places as may be directed by the consignor, for a reasonable price or reward, and to deliver them to the person or persons to whom they are directed to deliver them, and that it is also their duty to deliver all grain received by them in bulk, into the warehouse to which it is consigned, and that it is unlawful for them to deliver any grain into any warehouse other than that to which it is consigned, without the consent of the owner or consignee thereof.

The claim of the relators reaches to this extent. The objection to such a pretension is very obvious. It does not confine the legal duty of respondents to their own line of road. Beyond that this court has no power. Their duty is commensurate with their franchise, and can not, by this court, be made to extend beyond it, and the demurrer admits that the south line of Madison street, as stated in the return, is the limit to which their franchise extends, while the elevator is north of that point some five hundred feet or more, entirely without the limits of respondents' charter.

But the relators say, that a railroad track is laid down on West Water street, running by the elevator with a switch, by which the elevator can be approached to load and unload cars, and which track was laid under an ordinance of the city of Chicago, passed August 16, 1858, but that the particular part in front of the elevator, and the switch were constructed by the

Pittsburgh, Fort Wayne & Chicago Railroad Company, and that, by the fourth section of that ordinance, respondents have the right to use this track, and, in fact, do use it; that they run all their cars upon a part of the track constructed under this ordinance, to reach their depots, and a run of five hundred feet beyond their passenger depot, would bring the cars to relators' elevator.

To this it is answered by respondents, that they have never acquired any right to run their cars north of the south line of Madison street, the terminus of their railroad, and that none of their engines or cars have the right to pass north of this south line without obtaining permission of the railroad companies owning them, and paying to them such sum as may be charged for their use. And they further say, they have no right to send their cars over the tracks leading to this elevator without special permission, and upon paying the owners of the tracks compensation therefor, and that they have never held themselves out to the public as common carriers beyond the *termini* of their own line of road, and that whenever their cars have been permitted to go beyond the terminus of their road, it has been done by virtue of special agreements made to that effect; and they further say, they have never accepted the provisions of the ordinance of the sixteenth of August, 1858; that while it may be true, as alleged, the Pittsburgh, Fort Wayne & Chicago Railroad Company, and the Chicago, St. Paul and Fond du Lac Railroad Company, did construct the tracks from Van Buren to Kinzie street, it is not true that respondents had any part in their construction, or have availed of the provisions of the fourth section of that ordinance for the use of the tracks so laid north of the south boundary line of Madison street; nor have they ever acquired, by agreement or otherwise, as provided by the terms of that ordinance, any right to run their trains north of that line, nor have they had anything to do with the construction of any side or switch track connecting with any railroad track north of that boundary line in

West Water street, or in any other street in Chicago north of Madison street.

Here, we think, is presented the pith of this controversy. The facts are admitted by the demurrer to be true, and the question is, can a railroad company, chartered with certain express powers and privileges, with certain termini within which they are to be exercised, be compelled to purchase, for the accommodation of the public, more extended privileges beyond the limits of their franchise.

In the case of Vincent *et al.* against this same company, 49 Ill. 33, we took occasion, in defining the duties of common carriers as to delivery of articles carried, imposed by the common law, to advert to the relaxation of that rule in regard to railways.

We there said, the rule of the common law, requiring common carriers by land to deliver to the consignee, has been so far relaxed in regard to railways, from necessity, as in most cases, to substitute, in place of a formal delivery, a delivery at the warehouse or depot provided by the companies for the storage of goods, and that the decisions of this court, that a railway company may discharge themselves of their liability as common carriers, by safely depositing goods in their warehouse, and there holding them under the responsibilities of a warehouseman until demanded by the consignee, proceed upon the ground that a railway has no means of delivery beyond its own lines.

We consider this quotation very apposite in the present case, for it is admitted by the pleadings, that relators' elevator is not on the line of respondents' railway, and that they have no connection with it, or use of it, except such as they acquire by purchase when their own necessities or interests demand its use.

And in remarking on the custom which had grown up in this State, of carrying grain by rail in bulk, it is said, since it would be impossible for railroad companies to unload and store grain so brought, at their ordinary freight depots, a custom of

delivering it at elevators has obtained, to which it may be con-
signed, but it is indispensable such elevators must be con-
nected by some track with the railroad line, and be, in fact, a
portion thereof, for such we understand to be the meaning of
the opinion in that case. It could not be understood that,
although these respondents have connection by sidings or
switches, or other contrivances, with other roads running into
Chicago, they should be compelled to use them to reach an
elevator upon such road situate, it may be miles beyond the
*terminus* of their road, and not on the route of their own road.
We know of no power which can compel a railroad company
to exercise its franchise beyond its own *termini.* Within those
limits, this court can exercise a supervisory power over them,
and, as in Vincent's case, enjoin them. That proceeding was
upheld, because the siding to their elevator was a part of the
track of the respondents. In commenting upon the act of the
legislature of February 22, 1867, entitled, " Warehousemen,"
in answer to the argument of the respondents, that the act did
not mean that railway companies shall deliver grain at points
off their line, the court said, clearly it does not, but the question
recurs—what points are to be considered on the line of a rail-
way for the purposes of delivery under this law? They con-
tend that its line consists of its main track, and such side
tracks as may belong to it. The court said, when a railroad,
for a valid consideration, has allowed the owner of adja-
cent land to lay a side track connecting with its own rails, and,
as in the case then before it, had permitted the connection to
be made, and the side track to be laid for the use of a particu-
lar lot of ground, and in order to transport to such lot heavy
articles, and the owner of the lot and side track has his ware-
house in readiness for the receipt of such freight, then such
side track must be considered as a part of its line for the pur-
poses of delivery under the statute.

In the same opinion, it was conceded that a railway company
could not be required, by legislative enactment, to transport
freight beyond its own line.

108        THE PEOPLE *ex rel. v.* C. & A. R. R. Co. [Sept. T.,

Opinion of the Court.

This, we think, settles the matter in dispute between these parties, unless an additional obligation has been imposed upon these respondents by the ordinance of the city, of August 16, 1858.

It is admitted by the pleadings, that respondents had no agency in constructing the tracks which pass by this elevator, and have never availed of the provisions contained in that ordinance, and have never authorized or permitted a connection with their line of road of any switch or side track constructed on the street in which this elevator is situate, and it is further admitted that the lawful northern terminus of their road is the south line of Madison street.

If, then, by legislative enactment, a railroad company can not be compelled to transport freight beyond their own line, with what propriety can it be urged that a permission to use tracks, which they were not instrumental in connecting with their line, and which are beyond their terminus and the property of other parties, shall have a greater effect than a legislative enactment? Does the permission of the city authorities to use these tracks impose an obligation on the respondents to use them? If the legislature, with its vast powers, can not so compel them, it would be strange, indeed, if the act of a subordinate authority should have that effect. The ordinance cited can have no other effect than to legalize a departure from their line of road, should the respondents desire to do so. Relators allege that respondents have the right to use this track, and, in fact, do use it; that they run all their cars upon a part of it to reach their depots, and a further run of five hundred feet beyond their passenger depot would bring them to this elevator. As a general fact, we believe cars with heavy freights, like grain in bulk, do not make the depot for passengers their stopping place. They usually stop at the freight depot, and that, judging from the diagram attached to the return, the accuracy of which is not questioned, must be more than five hundred yards south of this elevator. The fact that the respondents use this track is not denied in the return,

but the respondents say, and that is admitted by the demurrer, that all these tracks laid in West Water street, and north of Madison street, are owned exclusively by the Chicago & Northwestern and the Pittsburgh, Fort Wayne & Chicago railroad companies, who control the manner of using them, and charge track service for every car run over them by respondents, and by other railroad companies. The respondents further say, and this is also admitted, that although they may have delivered coal over that switch, to that elevator, they have never done so except by special agreement made for that purpose.

That a railroad company may, by special agreement run their cars over the track of another, is not doubted, but that they can be compelled to do so, is not and can not be admitted. If the ordinance of August, 1858, intended a favor to this and other companies, still, the companies can not be coerced to accept the favor. So long as they perform their duties under the privileges and powers granted them, the people have no right to complain. To compel a railroad company to receive and deliver freight at points off and beyond their own line, would be not only oppressive, and involve their business in inextricable confusion, but would impose burdens and responsibilities upon them which they never contracted to assume. A reference to the diagram accompanying the return of respondents, and to which we have before referred, taken in connection with the statement in the return, which is admitted to be true, it will be seen, that all the tracks leading into West Water street belong exclusively to the Pittsburgh, Fort Wayne & Chicago railroad company, while those owned by these respondents jointly with that company, as also those owned exclusively by respondents, all terminate at or near the south line of Madison street. The question, then, becomes pertinent, should a mandamus be awarded, how could respondents obey it? Could they, without the permission of the first named company, run their cars over their tracks? Could the writ command them to purchase the right so to run them, of that company? Can a writ of mandamus be made to perform such an office?

Would this court be justified in so trenching upon the rights and franchise of the Pittsburgh, Fort Wayne & Chicago railroad company? They have chartered rights which can not be infringed so long as they properly perform their duties under their contract, and it would be going to an unwarrantable extent, in order to compel one company to perform a supposed duty, to trespass upon the chartered privileges of another.

This court said, in *The People ex rel. v. Hatch,* and the *Same v. Dubois,* 33 Ill. 9, at page 140, that a mandamus should not issue in any case unless the party applying for it shall show a clear legal right to have the thing sought by it done, and in the manner and by the person or body sought to be coerced, and must be effectual as a remedy if enforced, and it must be in the power of the party, and his duty, also, to do the act sought to be done, and is never awarded unless the right of the relator is clear and undeniable, and the party sought to be coerced is bound to act. And in *The People, etc. v. Gilmer,* 5 Gilm. 242, it was held, that a mandamus could only be issued to compel a party to act, when it was his duty to act without it—that the writ conferred upon him no new authority. And the duty must be a public one, and must be imperative and not discretionary. Tapping on Man. 65. This has peculiar application to the fourth section of the ordinance, so much insisted upon by relators. That section nowhere confers any rights upon respondents. As we understand its terms from respondents' brief, the ordinance not being before us, it provides, only, that the railroad companies, to whom the right to lay down tracks in West Water street is given, may associate with them in the construction and use of said tracks any other corporations and shall allow and permit the use of said tracks by any other railroad corporation upon terms and conditions to be agreed upon.

It is admitted by the pleadings, that no agreement was ever made by the respondents for the use of these tracks. By the ordinance, it is discretionary with the companies to make such

agreements. This court can not compel respondents, if application was made to it, to enter into an agreement to use them. It is not their duty to make an agreement, it is a privilege, only, and, consequently, the court can not compel respondents to use these tracks, or any one of them. In short, it can not coerce a party to do what the law does not oblige him to do. Granting the writ would confer no power or authority upon respondents to enter upon and use these tracks. A plain dereliction of duty must be established before a mandamus can be awarded.

The ground of the decision in Vincent's case was, that the side track, under the circumstances attending its construction, became a part of the track of the railroad company, and they were, therefore, bound to deliver grain, carried by them in bulk, to the warehouse erected upon it, when consigned to such warehouse.

The return in this case shows, and the fact is admitted by the demurrer, that the respondents have provided, by contract with other parties, a warehouse on their own track, ample in capacity to contain all grain ordinarily transported in bulk over their line of road, having all the necessary machinery and appliances for speedily receiving, unloading and returning the cars in which it is transported, and have guarded consignors of such articles against imposition, by a covenant that the charges made at such warehouse shall not exceed those of other warehouses in the city of Chicago. A delivery, therefore, of grain in bulk to such a warehouse, if not consigned to any other warehouse on the line of their road, would be a fulfillment of the obligation resting upon them to carry and deliver such freight.

So long as no discrimination is made by railroad companies between warehouses on their line of road, shippers can have no real cause of complaint. So long as their grain is properly handled and stored, and at the usual charges, it can make but little if any difference to them by whom those services are performed, or where, and if no warehouse upon the line of a railroad

is designated by the consignor as the recipient, and as a delivery can not be made at the usual freight depot, what can be more reasonable and proper than a delivery to the warehouse they have furnished upon their own track, that being in all respects ample for the purpose. *Porter* v. *Ch. & R. I. R. R. Co.* 20 Ill. 407. As they can not be compelled to transport the grain beyond their track, or off it, so neither can they be compelled to receive it for such purpose. There is nothing in the warehousing act of 1867 opposed to this. The twenty-second section of that act clearly implies, that the warehouses designated by the consignors shall be upon the track of the road on which their grain is carried, and within the limits of its franchise. It never could have been the design of the act to compel one road to trespass on the chartered rights of another, or to purchase a privilege of the other.

It is urged by the respondents, in support of their return, that they have a right to refuse to receive grain in bulk, to be carried on their road, and can demand it shall be placed in proper packages, convenient for handling and storage in their cars, and for unloading.

When we consider the vast amount of grain annually produced for market in the rich country through which this road passes on its way to the great grain market of the West, the difficulty, if not impossibility, of providing sacks, barrels, or other safe contrivances to secure properly this production for shipment, is quite apparent. This led to the establishment of costly elevators, and they induced the custom, which has obtained with all railroads, in this State, at least, to receive grain in bulk, it being equally as well protected in that condition in its transit by cars as in sacks, and as speedily unloaded from them, by means of the steam power and appropriate machinery employed by them. These erections have had the same powerful influence upon the production of wheat, one of our great staples, as the introduction of the reaper, for without the agency of the latter, those vast fields yearly blossoming with this product, would be devoted to other purposes, and but

for the steam car and the elevator, if cultivated up to the limit of their capacity, their products could find no market. Hand in hand, these powerful influences are at work, and so long as the two latter make no unjust discriminations, and are satisfied with moderate charges, the stimulus to the agricultural interest will be unceasing, and nothing will be wanting to make this the great grain growing State of the West, if not of the Union.

We are not of opinion that respondents, or any other railroad company, can disregard the custom of conveying grain in bulk over the line of their own road, and delivering it at any elevator thereon, to which it may be consigned. If consigned to an elevator or warehouse not on their road, and beyond their terminus, or there be no elevator on the road on which the grain is carried, then they may rightfully refuse to receive it in bulk.

The facts stated in respondents' return, and the legal consequences flowing from them, for the reasons we have given, afford a complete justification for the refusal to receive the grain in question, the elevator to which it was consigned not being on their road, or within the limits of their franchise. We have examined all the cases to which reference has been made, and we are well satisfied the views here expressed conflict, in no particular, with any of them.

The demurrer to the return must be overruled.

*Mandamus refused.*

Mr. JUSTICE SHELDON : I hold, that so long as the respondents actually make use of the track leading to the relators' elevator, in running their cars over it, it is their duty to make delivery of grain there, under the rule laid down by this court in the case of *Vincent* v. *C. & A. R. R. Co.* 49 Ill. 33.

Mr. JUSTICE SCOTT : I concur in denying the peremptory writ in this case, on the ground, that the writ of mandamus is not the appropriate remedy for the wrong complained of. When the law affords another and complete remedy, I understand the

law to be well settled, that a writ of mandamus will never be awarded. On the state of facts presented by this record, the law furnishes a complete and ample remedy to the party injured.

Without discussing the case at length, I am of opinion, on the facts presented in the record, that it was the duty of the railroad company to receive the grain in question, and deliver it at the relators' warehouse, and for that purpose the company had the clear right to use the track in question, and for a failure so to do, they are liable in any appropriate common law action.

Mr. JUSTICE WALKER: I concur in the opinion announced in this case, but hold, that respondents, and all other railroad companies in the State, may be compelled by mandamus, when a proper case is made, to carry grain in bulk, if such is the customary mode of transportation, and to deliver it to any elevator on the line of their roads, or upon any of their side tracks or switches, to which it may be consigned ; and when such roads enter the city of Chicago, they should deliver grain therein in the same manner, when so consigned, on their own tracks, side tracks or switches, and at the elevators to which consignments are made, on other roads in the city with which they have running arrangements, unless they would be compelled to incur unreasonable expense in making such delivery. But they are not, nor can they be, required to construct new side tracks or switches, or extend the line of their roads, or to make running arrangements with other roads, or to purchase or lease other roads for the purpose of making such delivery.