## THE CHICAGO, BURLINGTON & QUINCY R. R. CO. ET AL.

### V.

### JESSE HOYT ET AL.

1. WAREHOUSES—COMPELLING DELIVERY OF GRAIN.—If the place of consignment can be reached by any track, of which the railroad company is the owner or lessee, or in the lawful use, or which can be lawfully and rightfully used by it, the company is bound to deliver at that place. But this is the extent of the duty imposed by the Constitution. The contrary interpretation would involve the fundamental law in the absurdity of commanding the performance of an unlawful act.

2. DELIVERY OVER TRACK OF ANOTHER COMPANY CANNOT BE COMPELLED.—Where a portion of the track over which the defendant company must run its cars, in order to deliver grain at the warehouse in question, belongs to another company, and no right has been obtained by the defendant, by purchase or otherwise, to use such track for that purpose, it cannot be compelled to make such delivery; nor can it be compelled against

C. B. & Q. R. R. Co. et al. v. Hoyt et al.

its will, to procure the right so to do. The legal aspect of the case is not changed by the fact that the owner of such connecting side-track has interposed no objection to the use of this track by the defendant company in the past.

3. RIGHT OF WAREHOUSE OWNERS TO CONSTRUCT CONNECTING SIDE-TRACKS.—Had the owners of the warehouse themselves constructed tracks, side-tracks, etc., in and about their warehouse, suitable for the economical and convenient delivery of grain to said warehouse, and extended the same to the track of the defendant railroad company, and asked to be allowed to form a junction with that track, a very different class of questions would have been presented.

4. RIGHT OF A MAJORITY OF CO-PROPRIETORS TO CONTROL THE BUSINESS.—Whatever may, ordinarily, be the power of a majority in interest over the business of a public warehouse, their right to exercise such control, in utter disregard of the rights and wishes of the minority, cannot be conceded; and under the facts in this case, the majority have not entitled themselves, as against the rights of the minority, to the relief prayed for in the supplemental bill.

APPEAL from the Circuit Court of Cook county; the Hon. E. S. WILLIAMS, Judge, presiding.

Messrs. GOUDY, CHANDLER & SKINNER, for appellants; argued that complainants were not entitled to the relief sought because their elevator cannot be reached by any track owned by the defendant railroad company, and cited Vincent v. C. & A. R. R. Co. 49 Ill. 33; The People ex rel. Hempstead v. C. & A. R. R. Co. 55 Ill. 95; C. & N. W. R'y Co. v. The People, 56 Ill. 365; Rouse v. Home of the Friendless, 8 Wall. 430; Rouse v. Washington Union, 8 Wall. 439.

Upon the question of legislative control over private property: Munn v. Illinois, 4 Otto, 123.

That a mandatory decree ought not to have been entered against the railroad company: Lane v. Newdigate, 10 Ves. 192; Irenberg v. East India Co. 33 L. J. Chy. 392.

Messrs. WILLIAMS & THOMPSON, for appellants; that delivery to warehouses not on the line of the company's track cannot be compelled, cited People ex rel. v. C. & A. R. R. Co. 55 Ill. 95; Vincent v. C. & A. R. R. Co. 49 Ill. 33; Spruance v. C. & N. W. R'y Co. 57 Ill. 436; Bridge Co. v. The

State, 18 Conn. 64; Commonwealth v. Essex Co. 13 Gray, 239; Commonwealth v. Bridge Co. 2 Gray, 339.

Upon the right of the railroad company to remove its side-track and connections: Jackson v. Railroad Company, 11 Am. L. Reg. 378; Heyl v. P. W. & B. R. R. 51 Pa. St. 469; Woodward v. Seeley, 11 Ill. 157.

That complainants, not being sole owners of the warehouse, are not entitled to the exclusive management of it : Freeman on Co-tenancy, § 331; Johnson v. Sepulbeda, 5 Cal. 149; Livingston v. Lynch, 4 Johns. Ch. 573; Green v. Miller, 6 John. 39; Davis v. Hawkins, 3 M. & S. 488; Parsons on Partnership 221; Steamboat Orleans v. Phœbus, 11 Pet. 175; Glassington v. Thrwaites, 1 Sim. & S. 124; Const. v. Harris, Turn. & R. 496.

That the purpose contemplated by complainants was in effect a secret combination or contract to control the price of grain, cost of storage etc., and the same was fraudulent and void: Croft v. McConoughy, 79 Ill. 346; Fairbank v. Leary, 40 Wis. 637; Morris Run Co. v. Barclay, Co. 68 Pa. St. 173; Hooker v. Vandewater, 4 Denio, 369; Stanton v. Allen, 5 Denio, 434; Hilton v. Eckersly, 6 E. & B. 47; Brooks v. Martin, 2 Wall. 75.

That no suit can be maintained by a part only of those engaged in some common undertaking, when the remaining owners decline to join in such suit, unless the suit is necessary for the protection of the common property; and generally as to the rights and remedies of tenants in common: Hall v. Hall, 3 Mc. N. & G. 79; Waters v. Taylor, 15 Ves. 10; Roberts v. Eberhardt, Kay, 148; Miles v. Thomas, 9 Sim. 606; Peacock v. Peacock, 16 Ves. 57; Cooper v. Cedar Rapids Water Power Co. 42 Iowa 398; Hanson v. Willard, 12 Me. 142; Smith v. Smith, 10 Paige 470; Hale v. Thomas, 7 Ves. 589; Thwort v. Thwort, 16 Ves. 128; Goodman v. Spray, 2 Dick. 667; Smallman v. Onions, 3 Bro. C. C. 621; Hawley v. Clows, 2 Johns. Ch. 122; Obert v. Obert, 5 N. J. Ch. 397; Crest v. Jack, 3 Watts. 238; Thurston v. Dickinson, 2 Rich. 317; Chambers v Jones, 72 Ill. 275; Baldwin v. Parker, 99 Mass. 74; Gardner v. Deidrichs, 41 Ill. 198; Adams v. Briggs, Iron Co. 7 Cush. 361; Bennett v. Clements, 6 Allen, 10; Washburn on Easements and Servitudes, 37.

C. B. & Q. R. R. Co. et al. v. Hoyt et al.

That the complainants are shown to have been guilty of fraud upon their associates in the matter of rebuilding the elevator, and coming into court with unclean hands are not entitled to relief : Story's Eq. Juris. § 298; Roberts v. Roberts, 3 P. Wms. 74; Croft v. McConoughy, 79 Ill. 346; Cassady v. Cavenor, 37 Iowa, 300; Carter v. Winslow, 38 Vt. 691; Fetridge v. Wells, 13 How. Pr. 385.

That complainants at the time of bringing the suit had not obtained a license to transact business, as required by law: Laws of 1871, Act relating to warehouses, § 3; Munn v. The People, 69 Ill. 80; Munn v. The People, 94 U. S. 113.

That this defect is not cured by obtaining a license before filing a supplemental bill: Story's Eq. Pl. § 336; Candler v. Pettit, 1 Paige 168; Fry v. Quinlan, 13 Blatch. 205.

That a mandamus will not be issued to compel the performance of an act which the court has not complete authority to require to be done: *Ex parte* Paine, 1 Hill, 666; *Ex parte* Clapper, Hill, 548.

That the injunction awarded by the court below is mandatory, and ought not to have been granted: Baxter v. Board of Trade, 83 Ill. 146; Fisher v. Board of Trade, 80 Ill. 86; Menard v. Hood, 68 Ill. 121; Wangelin v. Goe. 50 Ill. 459; 2 Green's Chy. N. J. 141.

Mr. MELVILLE W. FULLER for appellees: contending that the defendant company is bound to deliver over the track in question, because it is part of its lines, in view of the circumstances under which it was laid, cited C. & N. W. R'y Co. v. The People, 56 Ill. 365; Vincent v. C. & A. R. R. Co., 49 Ill. 33; Munn et al. v. The People, 94 U. S. 113; Munn v. The People, 69 Ill. 80; C. & A. R. R. Co. v. The People, 67 Ill. 11; C. B. & Q. R. R. Co. v. The People, 77 Ill. 443; People v. C. B. & Q. R. R. Co., 94 U. S. 155; Olcott v. Supervisors, 16 Wall, 695; People v. C. & N. W. R'y Co., 57 Ill. 436; Constitution Art. XI. §§ 82, 85; Rev. Stat. 1874, 815.

That the company cannot remove the side-track: State v. R. R. 29 Conn. 538; Vincent v. C. & A. R. R. Co. 49 Ill. 33.

That the relief awarded was proper: Vincent v. C. & A. R.

R. Co. 49 Ill. 33; 20 N. J. Eq. 379; Fry on Spec. Performance, 433; City of Ottawa v. The People, 48 Ill. 233.

That relief cannot be denied because the two co-proprietors refused to join in the bill of complaint: Haven v. Mehlgarten, 19 Ill. 91; Thorndike v. DeWolf, 6 Pick. 120; Peacock v. Cummings, 46 Penn. 434; Mills v. Thomas, 9 Sim. 609; Parsons on Partnership, 228, 316, 578; Livingston v. Lynch, 4 Johns Ch. 573.

The objection that appellees do not come with clean hands, for want of license or otherwise, cannot prevail: Pangborn v. Westlake, 36 Iowa, 546; Lester v. Howard Bank, 33 Md. 558; 18 Mo. 229; Cooley on Const. Lim. 181; Baker v. Braman, 6 Hill. 511; Ferguson v. Landram, 1 Bush, 548; Home Ins. Co. v. Security Ins. Co. 23 Wis. 171; Deming v. The State, 23 Ind. 416; Harris v. Runnells, 12 How. U. S. 79; Story's Eq. Jur. §§ 298, 300; Rev. Stat. 820, §,100; Act of May 21, 1877, 169.

No adequate excuse is shown for refusal to deliver: C. & N. W. R'y Co. v. The People, 56 Ill. 365; Reg. v. B. R'y Co. 2 Ad. & E. (N. S.) 47; Reg. v. York & U. M. R. 16 Eng. Law &. Eq. 299; 42 Eng. C. L. 575; Galena, etc. R. R. Co. v. Rae, 18 Ill. 488.

Upon the question of jurisdiction of the court: Robinson v. Lord Byron, 1 Bro. C. C. 588; Great N. of Eng. R. Co. v. C. R. Co. 1 Coll. 507; Henry v. Smith, 1 K. & J. 392; Att'y Gen. v. Borough of Birm. 4 K. & J. 547; Rogers' L. & M. Works v. Erie R. W. Co. 2 N. J. Eq. 390; Fry on Specific Performance, 433.

BAILEY, J. On the 27th day of November, 1876, appellees exhibited their bill in chancery in the Circuit Court of Cook county, praying for an injunction to restrain the Chicago, Burlington & Quincy Railroad Company from taking up a certain side-track connecting the main track of said company's railroad with a track running into a certain grain warehouse in Chicago, known as the "Union Elevator." The complainants are the owners of an undivided three-fourths of said warehouse, and Armour and Munger, two of the appellants, own the remaining one-fourth; but they, having interest in the subject

matter of the suit, adverse to the complainants, were joined with the Chicago, Burlington and Quincy Railroad Company, as defendants to the bill.

An injunction, *pendente lite*, was granted as prayed for, and afterwards, on the 5th day of April, 1877, the complainants filed a supplemental bill, charging, that said company had refused to deliver at said warehouse certain car loads of grain received by it, consigned thereto, and were refusing to receive for transportation, grain consigned to said warehouse, and praying that said company be commanded to receive grain so consigned, and to deliver the same to said warehouse, and be restrained and enjoined from refusing so to do. Issues were duly formed upon both said original and supplemental bill, by answers and replications, and the cause being heard in the court below, upon the pleadings and evidence, a decree was rendered in favor of the complainants, against said railroad company, in accordance with the prayer of both the original and supplemental bill, from which decree this appeal is prosecuted.

It appears, from the evidence, that the warehouse in question was built in 1861, by Charles M. Smith and Albert Sturgis, in pursuance of a certain agreement between them and the Chicago and Joliet Railroad Company, made on the 26th day August, 1861. By this agreement, Smith and Sturgis undertook to construct, maintain and operate said warehouse, and receive and store therein all grain transported thereto by said company, observing, in so doing, the rules customary with other similar warehouses in Chicago, and exacting a compensation for storage no greater than that charged by other similar warehouses. Said Smith and Sturgis also agreed to furnish to said railroad company, free of cost, the necessary ground adjoining said warehouse, and between the same and said company's railroad, for laying down tracks, side-tracks and turnouts. Said company, on its part, agreed to lay all necessary tracks, side-tracks and turn-outs to said warehouse, for the use of said railroad and warehouse, in the best practical manner, for the mutual benefit and convenience of the respective parties to said agreement, reserving the right to remove said

tracks, in case any of the covenants or agreements on the part of said Smith and Sturgis, should not be fully complied with. Said company further agreed to deliver, or cause to be delivered, to said warehouse, all grain transported over its railroad from all points southward of Chicago, discriminating therein in favor of said Smith and Sturgis, as against other warehousemen in Chicago, provided it could do so legally and without prejudice to its own interest. Upon the construction of said warehouse, the Chicago and Joliet Railroad Company, or its lessee and successor, the Chicago and Alton Railroad Company, laid down two tracks running from the main track of what is now the Chicago and Alton Railroad, into said warehouse, and also constructed in front of and about said warehouse, side-tracks, turn-outs, etc., sufficient for the convenient and economical delivery of grain by it to said warehouse. For several years after its erection, this warehouse was the principal if not the only place in use, for the storage of grain shipped to Chicago over the Chicago and Alton Railroad, but within the past few years, several other similar warehouses have been built on the line of said road, which now compete with it for this business. With the exception only of such grain as has been delivered to it by the Chicago, Burlington and Quincy Railroad Company, the sole business of this warehouse has been the storage of grain shipped over the Chicago and Alton Railroad.

The evidence shows that there are in existence in Chicago, on the line of the Chicago, Burlington and Quincy Railroad, three grain warehouses, known as Burlington elevators "A," "B" and "C," of sufficient capacity to store all grain shipped over that road, and furnished with all tracks, side tracks, turn-outs, etc., necessary for the convenient and economical delivery of grain thereto by that road. In the year 1866, in consequence of the destruction by fire of one of these warehouses, and of unusually large shipments of grain, the Chicago, Burlington and Quincy Railroad Company, to provide for the additional storage required by the emergency, laid a side track running from its own main track, and connecting, about fifteen feet from the entrance to the Union Elevator, with one of

the tracks running into that elevator. So far as appears, no express permission was given by the Alton Company to form this connection, nor does there seem to have been any objection thereto made by said company, or by the owners of the warehouse. By means of the connection thus established, the Chicago, Burlington and Quincy Railroad Company was enabled to reach the Union Elevator, and during the year 1866 about one thousand car loads of grain were delivered thereto by said company. In the year 1868, this side track was removed by said company, thus severing its connection with said warehouse.

Shortly afterwards, Messrs. Munn and Scott, who, at the time, were managers and part owners of the Union Elevator, applied to said company to relay said track so as to enable the Michigan Central Railroad Company to thereby reach said elevator, for the purpose of receiving grain therefrom for transportation to the East, and on their application the track was relaid upon an express agreement or understanding, as is now alleged, that it should be used for no other purpose except for the removal of grain from said warehouse. It does not appear that the track, since being relaid, has been used for any other purpose than for shipping out grain, excepting that in 1873, about two hundred car loads of grain, mostly damaged, were delivered to this elevator by the Chicago, Burlington and Quincy Railroad Company. This delivery was made under very considerable disadvantages, owing to the fact that the doorways to the elevator were so low as not to admit of the entrance of the cars of that company without the removal of the brakes.

It appears that defendants, Armour and Munger, who are joint owners with the complainants in the Union Elevator, are largely interested in the Burlington Elevators, with which the complainants are seeking to bring the Union Elevator into competition. With a view to placing the Union Elevator in direct competition with the Burlington elevators, for the storage of the grain shipped over the Chicago, Burlington and Quincy railroad, the complainants, in the year 1874, caused the Union Elevator to be completely rebuilt, and the doorways enlarged

so as to admit the Burlington cars, at an expense of something over $100,000. Armour and Munger being, as it seems, in ignorance of the purpose for which these repairs were being made, gave their consent thereto, and paid their proportion of the expense incurred. There is no pretense that, up to the time of filing the original bill, any efforts or attempts had been made by the complainants to obtain shipments of grain to their warehouse over the Chicago, Burlington and Quincy railroad, but it is expressly averred that they had refrained from so doing in consequence of the hostility of that company, and a fear that should they attempt to obtain such shipments, the connection between said railroad and their warehouse would be instantly severed by the removal of said side-track. Having obtained their injunction restraining the removal of the track, they seem to have commenced soliciting shipments of grain to their warehouse, and having obtained certain consignments which the company refused to deliver to them, the company at the same time, as is alleged, instructing its agents along its line to receive for shipment no grain consigned to said warehouse, the supplemental bill was filed.

It is insisted that the complainants are not entitled to a decree, because the Union Elevator is not upon the line of road of the Chicago, Burlington and Quincy Railroad Company, and can only be reached by the use of a track belonging to the Chicago and Alton Railroad Company, the use of which, for the purpose, has not been secured.

The President of the Chicago & Alton Railroad Company was examined as a witness, and from his testimony it appears that the tracks leading to, as well as those inside the elevator, were built by his company out of its own materials, and that ever since they were built, said company had had charge of said tracks, and kept the same in repair.

He says the Chicago and Alton Railroad Company had never, to his knowledge, given any license to the Chicago, Burlington and Quincy Railroad Company to run its cars over said track, nor had it, to his knowledge, interposed any specific objection to such use of said tracks, except that on one or more occasions, it had claimed the first right to the use of the

C. B. & Q. R. R. Co. et al. v. Hoyt et al.

warehouse, though it had never claimed an exclusive right thereto. When his company had no occasion to use said tracks, he supposed the owners of the ground had the right to put them to other uses, but when it did use them, it had a right to them in preference to any one else.

Under these circumstances, can it be held that this elevator is on the line of the Chicago, Burlington and Quincy Railroad?

In Vincent et al. v. The Chicago and Alton R. R. Co. 49 Ill. 33, it was held that where the owner of property adjacent to a railroad had erected thereon a warehouse which was in readiness for the receipt of freight, and had, with the consent of the railroad company, for a valuable consideration, laid down a side track, connecting the track of the company with such warehouse; such side track was to be considered as a part of the line of the company, for the purposes of delivering freight at such warehouse. In the opinion Lawrence, J. says: "A railway company can, unquestionably, refuse to allow the owner of adjacent property to lay down a side track connecting with its own rails, but when, for a valid consideration, it has conceded that right, and, as in the case before us, has permitted the connection to be made, and the side track to be laid for the use of a particular lot of ground, and in order to transport to such lot heavy articles of freight, and the owner of such lot and side track has his warehouse in readiness for the receipt of such freight, then, we say, that such side track is to be considered as a part of its line for the purposes of delivery under the statute. There is no reason why it should not be so regarded, as much as if the elevator stood upon a side track belonging to the railway itself."

In The People ex rel. etc. v. The Chicago & Alton R. R. Co. 55 Ill. 95, the relator applied for a writ of mandamus, to compel a railroad company to receive a quantity of grain at one of its stations, to be transported and delivered to a certain grain elevator in the city of Chicago, situated upon a side-track connected with the defendant's road, but beyond its actual terminus. The side-track was owned and controlled by other companies with whom the defendant had no arrangement for its use,

except such as might be specially agreed upon in particular instances, though, under an ordinance of the city the defendant, could have compelled an arrangement for its regular and permanent use. Under such circumstances, it was held that the defendant could not be compelled to receive grain to be delivered at such elevator, beyond the terminus of its own road, and could not be compelled to acquire the right to use the side-track connecting its road with the elevator for the purpose of such delivery, and that the rights of the parties in that regard would not be affected by the fact that the defendant had previously, in repeated instances, delivered freight at the elevator by the use of the side-track running thereto, under special agreements for that purpose; that in order to compel a railroad company to deliver grain shipped on its road at the particular elevator to which it may be consigned, it is indispensable that such elevator should be connected with the company's line of railroad by some track which is in fact a portion of such line, or such as would, under the statute, be regarded for the purposes of such delivery as a portion thereof.

In The People ex rel. etc. v. C. & N. W. R. W. Co. 57 Ill. 436, it was held that, by the rules of the common law, railroad companies cannot be compelled to permit individuals to connect side-tracks of their own with the tracks of such companies in order to enable the latter to carry grain to warehouses situated off their lines of road.

The foregoing cases were decided while the act of 1867, in relation to warehouses, was in force. That act made it unlawful for any railroad company to deliver any grain into any warehouse other than that to which it was consigned, without the consent of the owner or consignee thereof, and punished by suitable penalties a failure by the railroad company to make a delivery according to the direction of the owner or consignee.

Under these decisions, however, it is clear that notwithstanding the mandate of this statute, a railroad company could not be compelled to deliver grain to any warehouse not actually on the line of its road, or on some track connected therewith under such circumstances that, for the purposes of such delivery it would be deemed, in law, a portion of its line. Manifestly

C. B. & Q. R. R. Co. et al. v. Hoyt et al.

under the doctrine of these cases, the Chicago, Burlington and Quincy Railroad Company could not be compelled to receive or deliver grain consigned to the Union Elevator.

It is claimed, however, by appellees, that the rules of law applicable to this subject have been changed by Sec. 5, Art. 13, of the Constitution of 1870, and the laws passed in pursuance thereof. The section of the Constitution referred to is as follows:

" All railroad companies receiving and transporting grain in bulk or otherwise, shall deliver the same to any consignee thereof, or any elevator or public warehouse to which it may be consigned, provided such consignee, or the elevator or public warehouse, can be reached by any track owned, leased or used, or which can be used by such railroad companies; and all railroad companies shall permit connections to be made with their track, so that any such consignee, and any public warehouse, coal bank or coal yard, may be reached by the cars on said railroad."

Section 1 of the act of April 25th, 1871, passed in pursuance of Article 13 of the Canstitution, requires all railroad companies to recive and transport grain in bulk, and to load the same, either upon its track at its depot, or in any warehouse adjoining its track or side track, without distinction, discrimination or favor between one citizen and another, and without distinction or discrimination as to the manner in which such grain is offered for transportation, or as to the person, warehouse or place to whom or to which it may be consigned. Section 3 of said act is as follows :

" Every railroad corporation which shall receive any grain in bulk for transportation to any place within the State, shall transport and deliver the same to any consignee, elevator, warehouse or place to whom or to which it may be consigned or directed. *Provided*, such person, warehouse or place can be reached by any track owned, leased or used, or which can be used by such corporation; and every such corporation shall permit connections to be made and maintained with its track, to and from any and all public warehouses where grain is, or may be stored." R. S. 1874, 815.

How far have these provisions of the Constitution and

statutes modified the rules of law applicable to this subject? We are aware of no decision of this question by the Supreme Court, and are, therefore, compelled to consider it unaided by the light of any authority. It is an indisputable fact that the track of the Chicago & Alton Railroad Company, leading into the Union Elevator, and with which the side-track of the Chicago, Burlington and Quincy Railroad connects, *was used* by the latter company in 1868, and again in 1873; and it is further true, that it is *physically possible* for said company to still use it for the transportation and delivery of grain into said warehouse. Does the Constitution, however, by the words "can be used," contemplate a mere physical possibility, or does it, with such physical possibility include the legal possibility or right to use such track? If the construction be insisted upon, that this mandate of the Constitution was designed to require railroad companies to use all tracks connected in a physical sense, merely, with their line of road, for the purpose of transporting grain to the place of consignment, it may well be doubted whether that instrument would not be obnoxious to the charge of impairing the obligation of existing contracts, so as to be itself within the prohibition of the Federal Constitution. An imposition of the duty to use the tracks of other companies, which of necessity would involve the further duty of acquiring by purchase or otherwise the right so to do, might well be held to be such an invasion of the franchises granted to these companies by their charters, and the rights and immunities guarantied to them by their contract with the State, as to be beyond the legal competency of the people in the formation of their organic law.

But we are unable to adopt the construction here suggested. We cannot suppose it to be the intention of the Constitution to abridge the rights and immunities vested in these corporations by their charters, or to impose upon them the duty of performing any act which they have no legal right to perform. To the extent of their legal rights and powers, the mandate of the Constitution is doubtless operative. If the place of consignment can be reached by any track of which the railroad company is the owner or lessee, or in the lawful

use, or which can be lawfully and rightfully used by it, the company is bound to deliver at that place. This, however, we think, is the extent of the duty imposed by the Constitution. The contrary interpretation would involve the fundamental law in the absurdity of commanding the performance of an unlawful act.

So long as a portion of the track over which the defendant company must run its cars in order to deliver grain at the warehouse in question, belongs to another company, and no right has been obtained, by purchase or otherwise, to use such track for that purpose, it cannot be compelled to make such delivery. Nor can it be compelled against its will to procure the right so to do. We cannot perceive that the legal aspects of the case are changed in the least by the fact that the Chicago and Alton company has interposed no objection to the use of this track by the Burlington company in the past, and may reasonably be expected to acquiesce in such use in the future. Such acquiescence would be a matter of grace and not of legal duty, and might at any instant be withdrawn. The courts will not lend their aid to decree the performance of acts so long as the right to perform depends upon the pleasure or caprice of parties not before the court, who, by the withdrawal of their acquiescence or permission, may, at any time, render the performance impossible, and the judgment of the court nugatory.

It should be observed that the Chicago and Alton Railroad Company is not a party to this suit, and is not bound by the decree. What relief might have been granted had that company also been brought before the court and a decree sought against the present defendant, requiring it to deliver to the Alton Company grain consigned to the Union Elevator, and against the Alton Company, requiring it to receive such grain, and deliver it to said warehouse, we do not decide.

It would seem that the last clause of the section of the Constitution above cited, requiring all railroad companies to permit connections to be made with their track, so that any public warehouse may be reached by the cars on such railroads, changes the rule laid down in Vincent et al. v. The C. & A. R. R. Co. and The People ex rel. etc. v. C. & N. W. R. W. Co. *supra*, in so

far as those cases hold that a railroad company cannot be compelled to permit individuals to connect side tracks of their own with the tracks of such companies, in order to enable the latter to carry grain to warehouses situated off their lines of road. Had the appellees themselves constructed tracks, side tracks, etc. in and about their warehouse, suitable for the economical and convenient delivery of grain to said warehouse, and extended the same to the track of the Chicago, Burlington and Quincy Railroad, and asked to be allowed to form a junction with that track, a very different class of questions would have been presented.

It is further insisted by the appellants that the decree should be reversed, because at the time the defendant company is alleged in their supplemental bill to have refused to deliver grain to their warehouse, they had not obtained a license to transact the business of public warehousemen, or filed their bond as required by law.

The warehouse in question belonged to the class of public warehouses designated by the warehouse act of April 25th, 1871, as class "A." Said warehouse act provides that "the proprietor, lessee or manager of any public warehouse of class A, shall be required *before transacting any business* in such warehouse, to procure from the Circuit Court of the county in which such warehouse is situated, a license permitting such proprietor, lessee or manager to transact business as a public warehouseman, under the laws of this State."

The act further provides for the execution, by the person receiving such license, of a bond conditioned " for the faithful performance of his duty as a public warehouseman of class A, and his full and unreserved compliance with all the laws of this State in relation thereto." R. S. 1874, p. 820.

The evidence shows that appellees procured their license as warehousemen on the 12th day of March, 1877. The supplemental bill, although filed on the 5th day of April, 1877, was signed and sworn to March 3d, 1877, which was prior to the date of said license. Necessarily the acts on the part of the defendant company, complained of in the supplemental bill, were of a date not later than March 3d, and so were anterior to

C. B. & Q. R. R. Co. et al. v. Hoyt et al.

the date of the license.   No grounds of complaint are set up in the pleadings arising after appellees received lawful authority to transact business in their warehouse.   At the time of the refusal by the defendant company to deliver grain to said warehouse, or to receive grain consigned thereto, appellees had no authority to transact business as public warehousemen, and the company was justified in refusing to treat with them as such.   Appellees must recover, if at all, upon the case made by their bill, and, as no case is there presented showing a refusal by the defendant company to receive grain consigned to their warehouse, or to deliver the same, at any time subsequent to the date of their license, we are unable to see upon what principle they are entitled to any relief under the supplemental bill.

Appellants make the further point, that appellees, being the owners of only an undivided three-fourths interest in the warehouse, cannot as against the owners of the remaining one-fourth interest, control the business of the warehouse, and so cannot maintain their bill for the relief sought in this case.

On the part of appellees it seems to be admitted that in business enterprises which are merely private in their nature and character, a majority of the proprietors have no power to control the minority in the absence of an express contract empowering them so to do.   But it is contended that the rule is different with enterprises of a public or *quasi* public character, and that the business of maintaining and operating a public warehouse being a public employment, and involving a public interest, comes within the principle that in matters of public concern the voice of the majority should govern.

Without intimating any opinion as to the correctness of the view here presented by the appellee, it seems to us plain that even if the case is one where the decision of the majority should govern, the minority had a right to notice and to be consulted. Their place of business was but a short distance from that of appellees.   It was entirely practicable, at all times, to keep them advised of the business purposes of the majority, and to accord them an opportunity of presenting to their co-proprietors, for respectful consideration, such objections as they might have thereto.   The majority, even if they had a right to the

ultimate control of their joint business enterprise, had no right to act without information to, or consultation with the minority: Story on Part. § 123.

The evidence shows that the whole project of soliciting consignments of grain to the Union Elevator over the Chicago, Burlington and Quincy Railroad, and of competing for the storage of grain shipped over that road, was conceived and determined upon by the appellees entirely without notice to, or consultation with, their co-proprietors, Armour and Munger. The plan seems, in fact, to have been studiously and carefully kept from their knowledge.

The warehouse was completely overhauled and repaired for the express purpose of fitting it for this new departure in the storage business. Yet Armour and Munger were induced to yield their assent to such repairs, and to pay one-fourth of the very large expense thereby incurred, by representations as to the general dilapidation and decay of the premises, while as to the real object of the repairs they were kept in profound ignorance. Whatever may ordinarily be the power of the majority in interest over the business of a public warehouse, we cannot concede their right to exercise such control in utter disregard of the rights and wishes of the minority. Says Mr. Story, in the section above cited: " If the majority should choose wantonly to act without information to, or consultation with the minority, it would hardly be deemed a *bona fide* transaction, obligatory upon the latter." We think, under the facts in this case, the majority have not entitled themselves, as against the rights and wishes of the minority, to the relief prayed for in the supplemental bill.

We do not understand that the right of appellees to an injunction restraining appellants from removing the side-track in controversy, has been seriously questioned by appellants. In our opinion, the decree to that extent should be affirmed. In so far as relief is decreed under the supplemental bill, the decree is erroneous, and should be reversed.

Other questions are presented by the record which we do not deem it necessary for us to consider or decide, but in accordance with the principles above enunciated, the cause will be

remanded to the court below, with instructions to modify the decree by striking out all relief decreed under the supplemental bill, and by ordering that the supplemental bill be dismissed.

Remanded.