THE PEOPLE *ex rel.* John T. Hinch

*v.*

CARTER H. HARRISON, Mayor.

*Opinion filed April 17, 1900.*

MUNICIPAL CORPORATIONS—*Hyde Park ordinance requiring frontage consent to application for saloon license is in force.* The ordinance of the village of Hyde Park in force April 4, 1889, requiring frontage consent of a majority of the property owners on both sides of the street in the block where a dram-shop is proposed to be kept, as a condition precedent to the granting of a license, was not repealed, by implication, by the ordinance of May 8, 1889, which amended sections 5, 6 and 10 of chapter 15 of the Hyde Park municipal code, since the two ordinances are not repugnant.

ORIGINAL petition for *mandamus.*

S. S. GREGORY, for petitioner.

CHARLES M. WALKER, Corporation Counsel, WALKER & PAYNE, and EDWIN BURRITT SMITH, for respondent.

Mr. JUSTICE CRAIG delivered the opinion of the court:

This was a petition filed in this court in the name of the People of the State, upon the relation of John T. Hinch, for a *mandamus* against Carter H. Harrison, mayor of the city of Chicago, to compel him to issue to relator a license to keep a dram-shop at No. 773 East Fifty-first

street, in the said city. The petition sets out in full chapter 15 of the municipal code of Hyde Park, passed March 28, 1887, which embraces in twenty-one sections the general subject of dram-shop licenses. Sections 5, 6 and 10 are as follows:

"Sec. 5. No person without a license to keep or maintain a liquor or beer wagon, shall, by himself or another, either as principal, agent, clerk or servant, directly or indirectly, sell or give away or deliver any intoxicating liquor in any less quantity than four gallons, by, from or with any liquor or beer wagon, or employ, control, manage or use any conveyance for such purpose.

"Sec. 6. The president and board of trustees, by resolution, may grant licenses to keep so many dram-shops, saloons or beer wagons in the village of Hyde Park, outside of prohibited districts, as they may think the public good requires; but they expressly reserve the power to revoke any license at their discretion, and whenever revoked for any violation of the laws of the United States or State of Illinois or ordinance of the village of Hyde Park, whether passed before or after the date of such license, the license fee shall be forfeited to the village of Hyde Park.

"Sec. 10. No person shall receive a license to keep or maintain a dram-shop, saloon or liquor or beer wagon within the limits of the village of Hyde Park except upon the payment in advance to the comptroller of the village, to be by him paid into the village treasury, of a sum at the rate of $500 per annum for each dram-shop, saloon, liquor or beer wagon."

On April 4, 1889, another ordinance relating to the granting of license was passed by the president and board of trustees of Hyde Park, as follows:

"*Be it ordained by the president and trustees of the village of Hyde Park:* Any person who shall desire to obtain a license to keep a saloon or dram-shop, shall, in addition to the requirements now provided by ordinance, present

his application in writing to the village comptroller for such license, in which shall be stated the name of the person or firm to whom the license is to be issued and the place where such saloon or dram-shop is to be kept, which application shall be signed by a majority of the property owners, according to frontage on both sides of the street in the block upon which such dram-shop is to be kept, and shall also be signed by a majority of the *bona fide* householders and persons or firms living in or doing business each side of the street in the block upon which such dram-shop shall have its main entrance: *Provided, however,* that any person or firm who shall have made application as aforesaid, and received a license to keep a dram-shop, shall not be required to present an application as above in order to obtain a renewal of the license to himself or firm until at least one-quarter ($\frac{1}{4}$) of the property owners or *bona fide* householders, persons and firms doing business upon both sides of the street in the block upon which the said dram-shop has its main entrance, shall file with the village comptroller, at least thirty days (30) prior to the time for the renewal of such license, a notice stating that the signers thereof object to the granting or renewing of the license to said person or firm. Upon receiving such notice the village comptroller shall notify the captain of police that such notice has been filed, and the captain of police shall at once notify or cause to be notified the holder or holders of the license; but a failure to give such notification shall not be construed as a waiver of the necessity for filing the application as provided above."

The petition sets out that this ordinance was in full force and effect until the passage and adoption of the following ordinance, May 8, 1889:

"*Be it ordained by the president and board of trustees of the village of Hyde Park:* That sections five (5), six (6) and ten (10) of chapter fifteen (15) of an ordinance entitled 'The municipal code of the village of Hyde Park,' approved

by the president of the board of trustees the 28th day of March, A. D. 1887, be and they are hereby amended so as to read as follows:

" 'Sec. 5. No person shall, by himself or another, either as principal, agent, clerk, servant or employe, directly or indirectly, sell, give away or deliver any spirituous, vinous or malt liquor in any less quantity than four gallons, in any one package, to any one, at any place other than a regularly licensed saloon or dram-shop, or from or with any liquor, beer or express wagon, or employ, control, manage or use any conveyance for such purpose; and hereafter no license shall be granted to keep or maintain any liquor or beer wagon within the village of Hyde Park. Any person violating any provision of this section shall, upon conviction, be fined not less than twenty dollars ($20) nor more than two hundred dollars ($200) for each offense.

" 'Sec. 6. The president and board of trustees, by resolution, may grant licenses to keep so many dram-shops or saloons in the village of Hyde Park, outside of prohibited districts, as they may deem proper; but they expressly reserve the power to revoke any license at their discretion, and when so revoked may declare the license fee forfeited to the village of Hyde Park.

" 'Sec. 10. No person shall receive a license to keep or maintain a dram-shop or saloon within the village of Hyde Park except upon payment in advance to the village comptroller, to be by him paid into the village treasury, of a sum at the rate of five hundred dollars ($500) per annum for each dram-shop or saloon, payable in three equal installments, on the first day of April, August and December of each fiscal year. Every license so granted, unless sooner revoked, shall expire at the end of the current fiscal year. Such license shall be dated as of the day of application, and no person shall be deemed duly licensed to whom a license has not been actually issued as herein provided.'

"Sec. 2. All ordinances and parts of ordinances in conflict with this ordinance are hereby repealed."

The petition avers that the ordinance of April 4, 1889, was, as matter of law, repealed by the ordinance of May 8, 1889, and at the time of the annexation of said village of Hyde Park to Chicago was of no force and effect in law; that said premises, No. 773 East Fifty-first street, are not within the territory mentioned in the village ordinances of Hyde Park within which no licenses to sell intoxicating liquors should be issued, but is within other territory in which licenses are permitted to be issued; that relator, for the year ending April 30, 1899, had such license duly issued by the said Carter H. Harrison, mayor, and under it conducted a dram-shop on said premises, but that shortly prior to the expiration of this license more than one-quarter of the property owners on the street in the block upon which the said dram-shop was located, filed with the proper authorities of the city of Chicago a protest or objection to the renewal of said license, as provided by the said ordinance of Hyde Park approved April 4, 1889, of which relator was notified; that relator applied on the first day of May, 1899, to the mayor for a renewal of his license for the year ending April 30, 1900, and tendered the customary bonds required by law and the ordinances, with good and sufficient sureties, which were filed with the city collector, and tendered and offered to pay the comptroller of Chicago the sum of $500 required for license; that Carter H. Harrison, mayor, refused to renew or issue such license to relator on account of the objection made by the property owners in the block upon which said dram-shop was situated; that said Carter H. Harrison insists the said ordinance is still in force, and refuses to consider or examine relator's application for a renewal of his license; prays for summons requiring respondent, Carter H. Harrison, to make answer, if any, why a peremptory *mandamus* should not issue requiring him to take and approve

the bonds and issue to relator a license, etc. The appearance of the respondent, the mayor, was entered and a demurrer interposed to the petition.

The only question involved in this proceeding is whether the ordinance of the village of Hyde Park in force April 4, 1889, requiring frontage consents of a majority of the property owners on both sides of the street in the block upon which a dram-shop is to be kept, as a condition precedent to the granting of license, has been repealed.

The ordinance of April 4 was intended to add additional restrictions to the ordinances then in existence, to the granting of license. The language of the ordinance is: "Any person who shall desire to obtain a license to keep a saloon or dram-shop, shall, *in addition to the requirements now provided by ordinance*, present his application in writing to the village comptroller for such license, * * * which application shall be signed by a majority of the property owners, according to frontage on both sides of the street in the block upon which such dram-shop is to be kept." This language shows it was not intended to repeal any part of the ordinances then in force, but the ordinance then adopted was intended as additional or supplementary to those then in force. Chapter 15 of the municipal code of Hyde Park (the original ordinance) provides for granting licenses to keep dram-shops, saloons and liquor or beer wagons, and sections 5, 6 and 10 were amended by the ordinance of May 8, 1889, which appellant claims repealed the ordinance of April 4, 1889. The title of the ordinance of May 8 shows it was not a general revision of the entire subject of the municipal code. The very words of the title disprove such a construction. The title is as follows: "Be it ordained by the president and board of trustees of the village of Hyde Park: That sections five (5), six (6) and ten (10) of chapter fifteen (15) of an ordinance entitled 'The Municipal Code of the Village of Hyde Park,' approved by the

president of the board of trustees the 28th day of March, A. D. 1887, be and they are hereby amended." The amendment was specific, covering only sections 5, 6 and 10 of chapter 15. On examining the original sections and comparing them with the amendment of May 8, it appears that these amended sections 5, 6 and 10 were entirely re-written but retained their numbers as in the original ordinance. The principal object of the amendment was *to abolish liquor and beer wagons*, and nothing else, and the sections amended are expressly specified. No allusion is made to the ordinance of April 4, 1889, for the reason, no doubt, it was not intended to change it in any respect.

The law does not favor the repeal of a statute by implication. In *Town of Ottawa* v. *County of LaSalle*, 12 Ill. 339, we said: "It is a maxim in the construction of statutes that the law does not favor a repeal by implication. The earliest statute continues in force unless the two are clearly inconsistent with and repugnant to each other, or unless in the latest statute some express notice is taken of the former plainly indicating an intention to repeal it; and where two acts are seemingly repugnant, they should, if possible, be so construed that the latter may not operate as a repeal of the former by implication. * * * So a subsequent statute which is general does not abrogate a former statute which is particular.—Dwarris, 674." The same rule is laid down in *Butz* v. *Kerr*, 123 Ill. 659, and also in the case of *Village of Hyde Park* v. *Oakwoods Cemetery Ass.* 119 Ill. 141. In Dwarris on Statutes and Constitutions (113, note 9,) it is said: "Repeals by implication are not favored. A statute will not be construed as repealing prior acts on the same subject (in the absence of express words to that effect) unless there is an irreconcilable repugnancy between them, or unless the new law is evidently intended to supersede all prior acts on the matter in hand and to comprise in itself the sole and complete system of regulation on that subject." "Where the powers or directions under the several acts

are such as may well subsist together, an implication of repeal cannot be allowed." (Ibid. 530, *et seq.*)

The contention of counsel for petitioner that section 6 as amended gave unlimited or unrestricted power to the president and trustees to grant licenses outside of prohibited districts, and that, having such unrestricted power, the ordinance of April 4, being restrictive, is repugnant thereto, is not, in our opinion, tenable. In the case of *People ex rel.* v. *Cregier,* 138 Ill. 401, which was a proceeding for a *mandamus* against the mayor of the city of Chicago, ordering and requiring him to issue a license to keep a dram-shop on certain premises situated within the corporate limits of what was formerly the village of Hyde Park prior to its annexation to the city of Chicago, we held that the law providing for the annexation of the territory of a village to a city saves in force the ordinances of the village relating to dram-shops until they are done away with by a vote of those living in the annexed territory. We also held that the reservation of a discretion in an ordinance is valid, as follows (p. 419): "By passing a general ordinance on the subject the municipal authorities may determine when, to whom and under what circumstances licenses may be granted, and if such ordinance is not unreasonable the power of the executive officers of the municipality to issue licenses will thereafter be controlled and measured by its terms. If no discretion is reserved in relation to the number or location of the dram-shops to be licensed, * * * such discretion may be exercised by the officers charged with the duty of issuing licenses, and if the ordinance restricts the location of dram-shops to certain portions of the municipal territory said officers have no power to issue licenses except in obedience to said restrictions."

The very language of section 6 of the original ordinance shows it is restrictive,—the granting of the license, "as they" (the president and board of trustees) "may think the public good requires." In the amendment the lan-

guage is, "as they may deem proper." These expressions show that discretion must be exercised by the president and board of trustees in the granting of licenses. The ordinance of April 4, which requires, "in addition to the requirements now provided by ordinance," that the application for a license shall be signed by a majority of the property owners according to frontage on both sides of the street in the block, etc., is no more of a restriction upon the power to grant license than the provision that no person shall be licensed without, by section 8, first giving bond in the sum of $3000; by section 9, that he give an additional bond of $500, signed by two freehold- ers; by section 10, that he pay in advance the license fee of $500, and that in the opinion of the president and board of trustees the license should issue. These must all be considered as restrictions upon the president and board of trustees, and the ordinance of April 4 is of the same character, and there is no repugnance between the two ordinances.

In the case of *City of Chicago* v. *Quimby*, 38 Ill. 274, which was an action of debt to recover a penalty, the act of the legislature had given the power of inspection to an inspector appointed by the board of trade. The char- ter of the city of Chicago empowered the city to regulate the inspection of flour, etc., and an ordinance was passed which required every person or business firm bringing or receiving flour, etc., to or at the Chicago market to have the same inspected by the city flour inspector. It was contended that as the charter authorized the appoint- ment of an inspector and the regulation of inspections, the power was exclusive in the city, and that the power granted to the board of trade was repealed by implica- tion. This court said (p. 278): "Such a repeal only takes place when the provisions of the two enactments are re- pugnant in their provisions. But in all cases, if a con- struction can be reasonably given by which both acts may stand, it will be adopted; but when they are incon-

sistent and the provisions of but one of the acts can be executed, we must conclude that the legislature, in adopting the latter, designed to repeal the former."

In *People ex rel.* v. *Cregier, supra,* it was said (p. 418): "The Dram-shop act * * * declares the business of selling intoxicating liquors in quantities less than one gallon to be criminal, except so far as it is expressly authorized and made lawful by license. The tendency of the liquor traffic is so completely shown by all human experience, that from an early day said traffic has been subjected in this State to the surveillance and control of the police power, and we presume such has been the case in most, if not all, civilized communities. The right, therefore, to engage in this business and to be protected by law in its prosecution can no longer be claimed as a common law right, but is a right which can be exercised only in the manner and upon the terms which the statute prescribes. The refusal to license deprives no man of any personal or property right, but merely deprives him of a privilege which it is in the discretion of the municipal authorities to grant or withhold."

In the case of *Swift* v. *People,* 162 Ill. 534, this court sustained the validity of an ordinance creating a local option district in a certain portion of Chicago, which provided that unless the person applying for a license should present to the mayor, with his application, a petition signed by a majority of the legal voters of that portion of the city of Chicago described in the ordinance, and asking for the granting of license, the mayor could not grant the license.

The two ordinances of April 4 and May 8, 1889, not being in conflict with or repugnant to each other, the ordinance of April 4 was not repealed.

The demurrer to the petition for a peremptory *mandamus* is sustained, the *mandamus* denied, and judgment will be entered against relator for costs.

*Mandamus denied.*