Carter H. Harrison, Mayor, etc., v. The People, etc., ex rel., etc.

1. MUNICIPAL CORPORATIONS—*Annexation of Villages to Cities—Effect on Existing Ordinances of the Village—Chicago and Hyde Park.*—By the annexation proceedings the ordinances of the village of Hyde Park, in relation to dram-shop licenses, became in force and operative as ordinances of the city of Chicago, applying to the territory of the village annexed.

2. ANNEXATION OF VILLAGES—*Discretion Reposed in the Village Board Transferred to the Mayor and City Council.*—The discretion reposed in the village board of the village of Hyde Park, by operation of the annexation proceedings, was transferred to and vested in the mayor and council of the city of Chicago.

3. SAME—*Exercise of the Discretion, etc.*—The discretion reposed in the village board of the village of Hyde Park, and by the operation of its annexation conferred upon the mayor and council of the city of Chicago, is a discretion which can not be exercised capriciously or in discrimination of similarly qualified persons, but is to be exercised only by general ordinance applying to all persons having the qualifications imposed by such ordinance.

4. CITY OF CHICAGO—*Dram-Shop Ordinances.*—The city council of the city of Chicago has, by its general ordinance governing the issuance of licenses for dram-shops in the city, done all that it, or the village board of the village of Hyde Park could have done in the way of exercising the discretion imposed upon it, in regard to issuing licenses for dram-shops, and has provided for the issuing of as many such licenses as may be legally applied for within the territory of the late village.

5. ORDINANCES—*Construction of, by Municipal Officers.*—The construction put upon an ordinance for a long period in the past by a city, will preclude its officers from insisting upon a different construction at the present time.

6. STATUTES—*Construction by Government Departments.*—Where the execution of a statute has been confided to a particular department of the government, courts will regard, and in doubtful cases, adopt the construction accepted and acted upon by such department.

7. MANDAMUS—*To Compel the Mayor of Chicago to Issue Dram-Shop Licenses for the Territory of the Late Village of Hyde Park.*—Where an applicant for a license to keep a dram-shop in what was the territory of the village of Hyde Park, prior to its annexation to the city of Chicago, presents his petition, showing a compliance with the requirements of the ordinances of the late village of Hyde Park in force at the time of its annexation, and such other requirements as are imposed by the city council upon all applicants for such licenses throughout the city, no

further action by the city council will be necessary to entitle such appli-
cant to the license, and he may enforce the issuance of it by mandamus.

**Mandamus**, to compel the issuing of a dram-shop license. Appeal
from the Superior Court of Cook County; the Hon. MARCUS KAVANAGH,
Judge, presiding. Heard in this court at the October term, 1900.
Affirmed. Mr. Presiding Justice WINDES, dissenting. Opinion filed
October 10, 1901.

CHARLES M. WALKER, Corporation Counsel, and COLIN
C. H. FYFFE, Assistant Corporation Counsel, attorneys for
appellant, GEORGE HUNT and FELSENTHAL & FOREMAN of
counsel, contended that the rule is inflexible that mandamus
will not lie where the right sought to be enforced is doubt-
ful. The relator must show a clear and indubitable right to
the writ, or it will not be granted; and the act sought to be
enforced must not only be lawful and proper in itself, but
it must also be one that the defendant may lawfully do.
The People v. Vil. of Crotty, 93 Ill. 180; Springfield & Ill.
St. Ry. Co. v. County Clerk, 74 Ill. 27; Swift v. Klein, 163
Ill. 276.

To entitle the relator to relief, it must appear that the
defendant is under a legal obligation to perform the act
sought to be commanded, and every material fact necessary
to show such legal duty must be averred in the petition.
People v. Madison County, 125 Ill. 334; Swift v. Klein, 163
Ill. 276.

The mere grant of power by the legislature to a munic-
ipal corporation to license, regulate and prohibit the sale
of intoxicating liquors will not, of itself, authorize its
authorities to issue a license. This power is dormant and
affords no authority to issue licenses until brought into life
and put into operation by appropriate legislation by the
municipal authorities.

Municipal authorities in cities and villages organized
under the general law of this State may, by ordinance, limit
the number of dram-shop keepers to be licensed therein.
Zanone v. Mound City, 103 Ill. 552; People v. Cregier, 138
Ill. 421; People v. Harrison, 185 Ill. 315; Revised Stat.,
Chap. 24, Sub. 46, Sec. 1, Art. 5 (Cities and Villages).
Revised Stat., Chap. 43, Sec. 3 (Dram-shops).

WINSTON & MEAGHER, attorneys for appellee; FREDERICK R. BABCOCK and SILAS H. STRAWN, of counsel.

Having in every respect complied not only with the ordinances of the city of Chicago, but also with those of the former village of Hyde Park, appellee is clearly entitled to a license, and a peremptory writ of mandamus should go. Zanone v. Mound City, 103 Ill. 552; Kadgihn v. Bloomington, 58 Ill. 229; People v. Cregier, 138 Ill. 419.

The general ordinances of the city of Chicago respecting dram-shops apply to all territory within the limits of said city, and upon the annexation of Hyde Park became applicable thereto, except in so far as they may be modified by the valid ordinances of the village of Hyde Park then existing. People v. Cregier, 138 Ill. 421; McGurn v. Board of Education, 133 Ill. 122; P., F. W. & C. Ry. Co. v. Chicago, 159 Ill. 369; C., R. I & P., Ry. v. Chicago, 143 Ill. 641; Snell v. Chicago, 133 Ill. 413.

Under a general ordinance of the city for licensing dram-shops, the city authorities can not exercise an arbitrary discretion by granting a license to a favored few and refusing a license to others who have in all respects complied with the laws and ordinances of the State and city. Zanone v. Mound City, 103 Ill. 552; E. St. Louis v. Wehrung, 50 Ill. 28; Chicago v. Rumpff, 45 Ill. 90; E. St. Louis v. Wider, 46 Ill. 351; People v. Creiger, 138 Ill. 401; Swift v. People, 63 Ill. App. 453; Schlaudecker v. Marshall, 72 Pa. St. 200.

By the annexation of the village of Hyde Park to the city, the power and authority of the president of the board of Hyde Park became vested in the mayor of Chicago, and the power and authority formerly vested in the town board passed to the council. The city council, and not the mayor, has the discretion to regulate the licensing of saloons. And this discretion can only be exercised through general ordinances. The mayor alone has not nor can he be given any discretionary power to refuse a license to one who has complied with the requirements of the general ordinances. Kinmundy v. Mahon, 72 Ill. 462; E. St.

Louis v. Wehrung, 50 Ill. 28; Zanone v. Mound City, 103 Ill. 552; People v. Creiger, 138 Ill. 401 (420); Swift v. Klein, 163 Ill. 269 (275); E. St. Louis v. Wider, 46 Ill. 351; Chicago v. Rumpff, 45 Ill. 90.

The city having construed the meaning of the word " block " for a long period of years, and having granted licenses to dram-shops in the village of Hyde Park upon that construction, is in equity and law now estopped from. claiming a different and strained construction of the meaning of that term.   Comstock v. Cover, 35 Ill. 470;  Opinions of Corporation Counsel of Chicago, 1872 to 1897, pp. 235–6.

MR. JUSTICE SEARS delivered the opinion of the court.

John Boetter, as relator, filed his petition in the Superior Court of Cook County for a writ of mandamus to compel Carter H. Harrison, mayor of the city of Chicago, to issue to the relator a license to keep a dram-shop at numbers 887 to 897 East Fifty-first street, located in that part of the city of Chicago which was formerly the village of Hyde Park.

The respondent, Mayor Harrison, answered the petition, admitting some of the allegations of the petition and denying others.

Upon replication to the answer the cause went to trial and the issues of fact raised were submitted to the court.

There was but little conflict as to the facts and but little evidence heard by the court, most of the facts alleged in the petition being admitted by the respondent.

The real controversy in the court below was as to the construction of ordinances of the village of Hyde Park, which ordinances are still operative in the territory which formerly constituted the village of Hyde Park and now constitutes a part of the city of Chicago.   The premises numbered 887 to 897 East Fifty-first street, are within an unsubdivided block of land, which block is in part bounded by Fifty-first street on the south and Grand Boulevard on the east.   The application for a license, the plat of the premises offered in evidence, and the stipulations of the parties disclose that the license applied for is to keep a dram-shop, known as Germania Garden, with its main entrance upon

Harrison v. The People.

Fifty-first street and its eastern boundary or limit a fence located about twenty-six feet west of the west line of Grand Boulevard. In other words, the Germania Garden, which is sought to be licensed as a dram-shop, fronts on Fifty-first street with its main entrance, and does not abut upon any other street, its nearest approach to any other street being to within about twenty-six feet of Grand Boulevard.

The village of Hyde Park was annexed to and became a part of the city of Chicago upon June 29, 1889, and by the annexation proceeding certain ordinances of the village of Hyde Park in force at the time of the annexation became in force and operative as governing, in the same territory, as a part of the city of Chicago, to the same extent as if they were ordinances of the city.

These ordinances, so far as here involved, are as follows:

" Chapter XV. Section 6. The president and board of trustees by resolution may grant licenses to keep so many dram-shops, saloons or beer wagons in the village of Hyde Park, outside of the prohibited districts, as they think the public good requires.

Section 7. The president of the board of trustees is authorized to issue licenses according to the resolution provided in section 6, and such license shall be signed by him and attested by the hand of the village clerk, and to be under the corporate seal of the village."

" 2085. Section 1. Any person who shall desire to obtain a license to keep a saloon or dram-shop shall, in addition to the requirements now provided by ordinance, present his application in writing to the village comptroller for such license, in which shall be stated the name of the person or firm to whom the license is to be issued and the place where such saloon or dram-shop is to be kept, which application shall be signed by a majority of the property owners according to the frontage on both sides of the street in the block upon which such dram-shop is to be kept, and shall also be signed by a majority of the *bona fide* householders and persons or firms living or doing business on each side of the street in the block upon which such dram-shop shall have its main entrance."

No resolution as provided for by section 6 of chapter 15, was ever adopted by the president and board of trustees of the village of Hyde Park, and no other provision has

ever been made by the city council of the city of Chicago
for the regulating of the number of licenses to be issued in
the territory in question, except as the general ordinance
of the city of Chicago for the issuing of licenses for dram-
shops may apply.

It is conceded that relator has procured the signatures of
the requisite number of property owners on Fifty-first
street, and of householders and persons and firms living and
doing business on Fifty-first street, where the main entrance
of the dram-shop is to be, in accordance with the require-
ments of the ordinance. But no signatures of property
owners on Grand Boulevard have been obtained.

The defense interposed by the mayor raises but two ques-
tions, viz : First, could the mayor issue any license within
this territory in lack of any resolution of the village board
of Hyde Park or the city council of the city of Chicago,
specifically fixing the number of licenses to be issued within
that territory ? Or, in other words, did the general ordi-
nance of the city of Chicago authorizing the issuing of
licenses to dram-shops throughout the city of Chicago apply
within this territory to authorize the issuing of licenses
whenever the special provisions, such as consent of prop-
erty owners, householders, etc., were complied with ? And,
second, was it necessary that relator should obtain signa-
tures of property owners upon Grand Boulevard as well
as upon Fifty-first street ?

The trial court resolved both of these questions in favor
of the relator and issued the writ of mandamus compelling
the mayor to issue the license.

We are of opinion that the trial court was right in its
determination of each of the questions presented upon this
appeal. By the annexation proceedings the ordinances of
the village of Hyde Park here in question became in force
and operative as ordinances of the city of Chicago applying
to the territory in question. People v. Cregier, 138 Ill. 401;
Swift v. Klein, 163 Ill. 269; People v. Harrison, 185 Ill. 307.

It is doubtless true that the discretion reposed in the vil-
lage board of the village of Hyde Park, and now, by opera-

tion of the annexation proceedings, conferred upon the council and mayor of the city of Chicago, as to the number of licenses to be issued in the territory in question, is a discretion which can not be exercised capriciously and in discrimination between persons similarly qualified, but only by general ordinances applying to all who have the qualifications imposed. City of Chicago v. Rumpff, 45 Ill. 90; E. St. Louis v. Wehrung, 46 Ill. 392; E. St. Louis v. Wehrung, 50 Ill. 28; Zanone v. Mound City, 103 Ill. 552; People v. Cregier, 138 Ill. 401.

In E. St. Louis v. Wehrung, *supra*, our Supreme Court said :

" In the proper exercise of this power, the city council should adopt general ordinances, prescribing a general rule by which licenses might be obtained. They might, no doubt, prescribe the character of persons who might or might not obtain licenses; or they might, in their regular or called meetings, in such manner as they might ordain, grant such licenses. The ordinances should prescribe the amount required to be paid for each license, either by an ordinance relating to the entire city, or grade the rates by divisions or portions of the city, or otherwise. The ordinance should be of that general character that all persons coming within its requirements should be entitled, by complying with its provisions, to receive a license. And the amount to be paid should be determined by ordinance or order of the council, and not left within the discretion of a single officer of the city."

In Zanone v. Mound City, *supra*, the court said :

" We do not decide that the municipal authorities may not limit the number of dram-shop keepers to be licensed, but this must be done, if at all, by ordinance."

And in People v. Cregier, *supra*, the same doctrine was again announced, as follows :

"We would not be understood as holding that a board of trustees may, by resolution merely, license one, and refuse to license another having precisely the same qualifications and local surroundings, our view being that an ordinance must, in advance of the issuing of any license, prescribe the terms and conditions upon which licenses shall be granted, so that all in like situation, with like

surroundings, and having like qualifications, shall have equal opportunity to avail themselves of its privileges, and that it is not admissible for a city council or board of trustees to retain power to license one and refuse to license another, through mere caprice or favoritism."

The contention of the learned counsel for appellant is, that because no resolution was ever adopted by the village board of the village of Hyde Park in exercise of the discretion reposed in it by the ordinance of the village, and fixing the number of licenses to be issued within the territory in question, and no resolution in this behalf has ever been adopted by the city council of the city of Chicago, therefore there is no power or authority vested in the mayor of the city to issue a license to any one within this territory. This contention, we think, can not be sustained. The city council of the city of Chicago has, by its general ordinance governing the issuing of licenses for dram-shops in the city, done all that it or the village board of the village of Hyde Park could have done by way of exercise of this discretion. In effect they have provided for the issuing of as many licenses as may be applied for within this territory, as well as in other portions of the city, subject to a compliance with the requirements of the ordinances which were in force in the village of Hyde Park at the time of the annexation. If, therefore, relator has complied with such provisions and requirements and such other requirements as are imposed by the city council upon all applicants for licenses throughout the city, no further action by the city council would be necessary before relator would be entitled to his license.

We have, then, only to inquire if relator has complied with these provisions. In this behalf it is only contended by the respondent that there is a failure to comply, in that no signatures have been obtained from property owners upon Grand Boulevard. The ordinance requires that the application for the license shall be signed by a majority of the property owners, according to frontage on both sides of the street in the block upon which such dram-shop is to be kept, as well as by a majority of the *bona fide* house-

holders and persons or firms living or doing business on each side of the street in the block upon which the dram-shop shall have its main entrance.

The dram-shop which relator seeks to keep, has its main entrance upon Fifty-first street. It is conceded by respondent that the requisite signatures upon Fifty-first street, both of property owners and householders, and persons or firms there living or doing business, have been obtained. It is also conceded that in all other respects the relator has complied with the provisions of the ordinances upon his part, except that he has not obtained signatures to the application by a majority of the property owners upon each side of Grand Boulevard. It is not contended that the word "block," as used in the ordinance, comprises the entire square, bounded by four streets, but it is conceded to mean only a street from one cross street to another. Nor do we think, if the contrary were not conceded, that the term "street in the block," as used in this ordinance, means instead of "street," four streets bounding a square. And if there were any room for doubt upon this matter, the construction put upon it during a long period by the city, in treating it as meaning a "street" and not four streets, would, we think, now preclude the mayor from insisting upon a different construction. The evidence establishes without conflict that the city has always construed this provision of the ordinance as designating by the term "street in the block," a street between cross streets and not the four streets bounding a square.

In Comstock v. Cover, 35 Ill. 475, where a question arose as to the construction of a provision by the revenue statute, the court held that the construction put upon a doubtful provision by the public officers required to act under it, operated to reduce the uncertainty to a fixed rule. And in People v. The Fidelity and Casualty Co., 153 Ill. 25, the court announced the same doctrine in the following language:

"Where the execution of statutes is confided to a particular department of the government, the court will regard,

and in doubtful cases adopt, the construction acted on by the department."

But we are of opinion that the language of the ordinance can scarcely be said to leave room for doubt but that the construction put upon it by the city and now conceded by the appellant, the mayor, to be correct, is the right construction. The mayor professes to have no doubts upon this ground, and, as we think, rightly; and therefore a doubt in this behalf as to relator's right can not be said to exist as reason for its refusal.

Therefore, the controversy in this behalf presents but one question, viz.: Is this dram-shop to be kept upon Grand Boulevard? The ordinance specifies the property owners upon the street upon which "such dram-shop is to be kept" as the ones, a majority of whom, according to frontage, must sign the application for a license. If this dram-shop is "to be kept" according to the application and under the license applied for, upon Grand Boulevard as well as upon Fifty-first street, then if a license could issue at all, the signatures of a certain proportion of the owners on Grand Boulevard were essential. But we are of opinion that it can not be held that this dram-shop is to be licensed to be kept upon Grand Boulevard. The premises described in the application, shown by the plat and by the evidence to be the premises upon which the dram-shop is to be located, do not at all abut upon Grand Boulevard. Twenty-six feet, the width of an ordinary city lot, intervene between these premises and Grand Boulevard. A brick building, shown by the plat in evidence as occupying about twenty-five feet, is upon the corner of Fifty-first street and between the Germania Garden, *i. e.*, the dram-shop here in question, and Grand Boulevard. Upon the trial, counsel for the respondent conceded that there was then a fence separating the Germania Garden from Grand Boulevard, which fence was some twenty-five or twenty-six feet distant from Grand Boulevard, and that "the space between that fence and the street had not been used as a dram-shop or a saloon, and that the present application does not ask for the use of

that portion of ground as a dram-shop or a saloon." It being thus conceded that the license applied for is to keep a dram-shop upon premises which do not front or in any way abut upon Grand Boulevard, it can scarcely be held that the dram-shop is "to be kept" on Grand Boulevard. Therefore the signatures of property owners upon Grand Boulevard were not essential.

The license which the mayor, under the coercion of the writ, would issue to the relator, would be no broader than the application warrants, and if the relator should attempt under such license to keep a dram-shop upon Grand Boulevard, the city has swift means of redress.

There appears in the record an ordinance of the city of Chicago by which it is provided in effect that no license shall be issued to any one to keep a dram-shop upon a boulevard or pleasure driveway. But inasmuch as we are obliged to hold that under the evidence and the concessions of counsel, the dram-shop here in question is not to be kept upon Grand Boulevard, this ordinance, like the one requiring signatures of property owners, becomes of no importance as applying to Grand Boulevard.

There being no other ground of refusal to issue the license sought by the relator, and it being conceded that in all other respects he is entitled to one, the judgment of the Superior Court ordering the writ will be affirmed.

Mr. Presiding Justice WINDES, dissenting.

I am unable to yield my assent to the ultimate conclusion reached in this case.

In view of the position assumed by the learned counsel for appellant, that the ordinance of the village of Hyde Park, referred to in the majority opinion, requires only the consent of a "majority of the property owners on both sides of every street upon which the premises on which the dram-shop is situated abut, and that this consent is necessary along the entire length of the block bounded by such streets," that is, the consent of a majority of the property owners on Grand Boulevard between Fiftieth and Fifty-first

streets, as well as on Fifty-first street, the conclusion reached by the majority is probably a correct one. I am, however, of opinion that this court is not bound by the construction placed upon the ordinance by the learned counsel of the mayor, or even by the mayor himself. The real question presented is whether the mayor was justified in refusing a saloon license to the relator. In fact, the first point in appellant's brief is, " The rule is inflexible that mandamus will not lie where the right sought to be enforced is doubtful. The relator must show a clear and an indubitable right to the writ."

In People v. Village of Crotty, 93 Ill. 180–90, in which a petition for a mandamus was filed to compel the appellee to issue saloon licenses to relator which had been refused, the court, in holding that mandamus should have been denied, among other things say:

"It is no answer to what we have here said, that appellee issued licenses to others under the same circumstances that it refused them to appellant, nor is it material that it may have placed its refusal to issue them to appellant upon an improper ground. * * * And if appellee had no right to issue them, it was wholly immaterial upon what ground it placed its refusal."

As early as the case of People v. Forquer, Beecher's Breese, 104–9, it was held that the writ of mandamus would not be granted where the right of the relator thereto was doubtful. This case was re-affirmed in People v. Hatch, 33 Ill. 9, in a carefully considered and exhaustive opinion, in which it was said:

"The writ of mandamus is a high prerogative writ, to be awarded in the discretion of the court, and ought not to issue in any case unless the party applying for it shall show a clear legal right to have the thing sought by it done, and in the manner and by the person or body sought to be coerced, and must be effectual as a remedy, if enforced, and it must be in the power of the party, and his duty also, to do the act sought to be done. It is well settled, that, in a doubtful case, this writ should not be awarded. It is never awarded unless the right of the relator is clear and undeniable, and the party sought to be coerced is bound to act."

Harrison v. The People.

The authority of this case is re-affirmed in numerous cases under varied facts and circumstances by, among others, the following: People v. Salomon, 46 Ill. 415–9; People v. R. R. Co., 55 Ill. 95–110; Commissioners v. People, 66 Ill. 339; Ry. Co. v. County Clerk, 74 Ill. 27–31; People v. Lieb, 85 Ill. 484–90; People v. Town of Oldtown, 88 Ill. 202; People v. Village of Crotty, 93 Ill. 180–7; People v. Johnson, 100 Ill. 537–43; Board of Supervisors v. People, 110 Ill. 577; R. R. Co. v. Suffern, 129 Ill. 275–81; Ill. Watch C. Co. v. Pearson, 140 Ill. 423–34; People v. McConnell, 146 Ill. 532–7; Swift v. Klein, 163 Ill. 269–76.

In some of the cases cited the court considered questions of fact appearing either by the pleadings or the proofs, and held, under such facts, whether the case presented by the relator was doubtful or not, or whether, under the facts as determined, he had a clear legal right to the writ. In others of the cases the court considered and construed laws and ordinances as to the particular case before it, and decided whether or not the case was doubtful or the legal right to the writ clear, and awarded or denied the writ, according as it determined, under the laws or ordinances, the case was doubtful or the right clear.

In the Johnson case, *supra*, which was mandamus to compel a county treasurer to pay a certain county order held by the relator, the court say, among other things:

"When, by reason of a complication of extraneous circumstances not specifically provided for by the statute, a well founded doubt arises, either as to the right of the applicant to receive the fund, or the duty of the officer to pay it out, mandamus is not the proper remedy. The right in such case being doubtful, the claimant must resort to some other appropriate remedy to determine it."

In the Pearson case, *supra*, which was to compel the secretary of state to file a certificate of the vote of stockholders of a corporation in favor of a change of its name, the court, after a careful consideration, both of the statutes and facts bearing upon the question presented in denying the writ, among other things said:

"The writ is never granted in doubtful cases, nor unless the party asking it has a clear right. Such doubt exists in the case at bar, and the petitioner has not a clear right to the relief asked."

In the Swift case, *supra*, in which the very ordinances here in question were construed by the court, though not on the point here raised, the court, among other things, said, in speaking of the right to the writ, it "should never be awarded unless the party applying for it shows a clear right to have the thing sought by it done, and by the person or body sought to be coerced. In doubtful cases it should not be granted;" and denied the writ, dismissing the petition because it failed to aver and the proof failed to ·show a clear compliance with the ordinances.

The following cases recognize the general rule so well settled in this State, and in their facts and the questions presented tend to illustrate the manner in which the courts have applied it, viz: Regina v. Ray, 44 Up. Can. O. B. 17; Tyler v. Taylor, 29 Grat. 765; Ex parte Lynch, 16 S. Car. 32-9; State ex rel. Miers v. Appleby, 25 S. Car. 100; Port Royal Co. v. Hagood, 30 S. Car. 519–23; Draper v. Noteware, 7 Calif. 276; Hall v. Stewart, 23 Kas. 396; Townes v. Nichols, 73 Me. 515; Cook v. Treasurer, 50 Ver. 231; Larkin v. Harris, 36 Ia. 93–7; and State v. Auditor, 43 ·Ohio St. 311–20.

In the case of Regina v. Ray, *supra*, where a mandamus was asked to compel the mayor of the town of Whitby to issue a distress warrant on a conviction made by him, the writ was denied because the by-law and the conviction thereunder were subject to several grave objections, thereby rendering the right to the writ a doubtful one.

In the Draper case, *supra*, the Supreme Court of California, on a construction of a statute of that State, denied the writ of mandamus to compel a county auditor to draw his warrant on the county treasurer in favor of the plaintiff for certain amounts, because under the statute of the state the right was not clear, the particular case presented not being within the terms of the statute, which required

the county auditor to issue orders on the treasurer of the county.

In the Hagood case, *supra*, which was an application for mandamus against Hagood and others, members of the state board of agriculture, to compel the respondents to issue a license to relator to mine phosphate rock in the lands of the state, it was claimed, among other things, that a statute of the State which vested the board with discretion to grant or refuse such license, was void under the constitution of the State. The court held it was not the province of the board of agriculture to determine the constitutionality of laws defining their own powers, and the courts would not, in such a proceeding, determine the constitutionality of statutes affecting the rights of third persons, and denied the writ for the reason, among others, that it was not the board's plain duty to issue the license when that was only made to appear by declaring an act of the legislature unconstitutional.

In the Hall case, *supra*, the Supreme Court of Kansas held that a mandamus should be denied which sought to compel the defendant, as clerk of the District Court of Greenwood County, to issue an execution on a certain judgment, which the court held was fairly open to at least two different constructions. The court say:

" As the judgment is ambiguous, and as it is fairly open to the construction given to it by the clerk and the court below, the plaintiff is surely not entitled to a writ of mandamus to compel the clerk to issue an execution upon it."

According to the construction given the judgment by the clerk, the plaintiff was not entitled to an execution, though under the construction claimed by the plaintiff the execution should have been issued.

In the Townes case, *supra*, which was an application to compel the directors of a mining company to require its officers to issue to petitioner a certificate of shares of stock of the company, the petition was denied because the court could not determine whether the petitioner's claim was a just and legal one or not, and, among other things, say:

"Mandamus is the right arm of the law. Its principal office is, not to inquire and investigate, but to command and execute. It is properly called into requisition in cases where questions of law or equity can not properly and reasonably arise. Its very nature implies that the law, although plain and clear, fails to be enforced and needs its assistance."

In the Larkin case, *supra*, the court considered the statutes as well as the facts in issue, and held that the case was not a doubtful one, and affirmed the judgment of the court below, denying the writ. The court, in speaking of the rule that mandamus will not lie where the case presented is doubtful, say:

"The term *doubtful right* means some other doubt than that arising upon a mere construction of a judicial order, or a legal doubt as to the effect or meaning of a record."

In the case of State v. Auditor, *supra*, which was mandamus to compel the auditor of Darke county to issue his warrant upon the treasury of that county in favor of the relator for a sum named, to pay for a site purchased by the county commissioners of him for a children's home, the court considered the statutes and the proof in the case, and held that under the law as applied to the facts in evidence, the legal right to the writ was clear and the case was not a doubtful one, though the court say, speaking of certain orders of the county commissioners bearing upon the case :

"It is not enough that the auditor may honestly entertain doubts concerning the propriety of the original order or the effect of the order of rescission. The right to a writ of mandamus to enforce the performance of an official act by a public officer depends upon his legal duty, and not upon his doubts. If his duty is clear, its performance will not be excused by his doubts concerning it, however strong or honest they may be."

The last two cases are the only ones I have been able to find, in the time at my disposal, which in any way indicate that the court will award a mandamus to compel the performance of an official act, when the legal right of the party seeking to enforce it does not clearly appear, or when the case presented is a doubtful one.

It will be noted, however, that in the last case the court held that the legal right was clear and the case not doubtful.    The case does not conflict with the others noted.

I therefore think that the great weight of authority is that relief by mandamus should not be awarded in a case such as the one at bar, where I believe that the legal right of the party seeking it is not clear and his case upon the proof, as applied to the law, is a doubtful one.    It is not enough that the officer should doubt his duty under the law or the facts presented.    The court must construe the law and pass upon the facts and determine for itself whether the legal right is clear or the case a doubtful one.

I think relator was clearly within all the provisions of the law entitling him to a license, except as to the matter of frontage consents.    What were his rights in that regard?

Section 1 of the ordinance in question provides that his application " shall be signed by a majority of the property owners, according to frontage, on both sides of the street in the block upon which such dram-shop is to be kept, and shall also be signed by a majority of the *bona fide* householders and persons of firms living in or doing business on each side of the street in the block upon which such dram-shop shall have its main entrance."

The ordinance plainly provides for two different and distinct classes of signers of the application : first, property owners on both sides of the street in the block upon which the dram-shop is to be kept, and, second, householders and persons or firms living in or doing business on each side of the street in the block upon which such dram-shop shall have its main entrance.    The latter class of signers, it is conceded, were presented to the mayor with the application, and that provision of the ordinance is clear and certain in its terms, being made so because the street is fixed as being the one upon which the dram-shop shall have its main entrance.    The difficulty arises as to the other class of signers.

In Webster, as well as the Century dictionary, a block is defined as " a square or portion of a city enclosed by streets,

whether occupied by buildings or composed of vacant lots." This definition is approved by the Supreme Court in Todd v. R. R. Co., 78 Ill. 530, and also by the Supreme Court of Kansas in the case of Ottawa v. Barney, 10 Kas. 270, but the cases are different from the one at bar.

In the Standard dictionary "block" is defined as "The distance along a street from one cross-street to another."

It is true beyond doubt that these different meanings are commonly accepted, but the question is, what was the meaning as used in the ordinance. To say the least, it seems doubtful and uncertain what was there intended by the use of the word block. If the ordinance had said "both sides of the street fronting that part of the block on which the saloon fronts," there could be no doubt of the meaning as applied to this case, and the relator would have been clearly within the law as to frontage consents when he presented an application signed by a majority of the property owners on that street, to wit, Fifty-first street. If the word block was intended to mean, as is claimed by relator, the distance between two streets, still the meaning of the ordinance is uncertain and doubtful. It says, "in the street in the block upon which such dram-shop is to be kept." The block does not necessarily mean the distance on Fifty-first street between Grand Boulevard and Calumet Avenue; it may mean any other of the three sides of the block, as no particular side is clearly specified. Moreover, it is not clear what street is meant. The phrase, "the street in the block," is inaccurate, though it evidently means the street along a side of the block, or the street on which the block abuts. That street may as well be said to be on any other side of the block as on Fifty-first street. But it may be said that phrase is limited by the words, "upon which such dram-shop is to be kept." It may be replied, and not without much force, these words are intended to limit the block and not the street. If so, then "the street in the block" might well mean a street on either side of the block. If Webster's definition is the one intended, then in view of the uncertainty of the meaning of the phrase, "the street in the

block," it might well be contended that the ordinance could not be certainly complied with without procuring the consent of a majority on both sides of each street on each side of the block.   To this it may be claimed such a meaning is absurd; this ordinance has never been so construed, but has in the past been construed as the relator contends is the proper construction.   The answer to which is, if such a construction is absurd, then the authors of the Century and Mr. Webster are ignorant of the meaning of a common English word.   That the ordinance has been differently construed in the past and the construction claimed by relator has been given it, is immaterial, as held in the Crotty case, *supra.*   The question is, was the mayor right in refusing relator a license, irrespective of the reasons he then had, or his counsel now urge, for such refusal ?   Had the relator a clear legal right, with frontage consents on Fifty-first street only, or was his cause doubtful because he did not present frontage consents on all the streets around the block ?   In view of the ambiguity of the ordinance, I am of opinion the mayor was right and that the case made by relator is doubtful; that he has failed to show a clear legal right to a mandamus.